**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| AUSTIN BEAULIER, individually and on behalf of all those similarly situated, <br><br>     Plaintiff, <br><br>   v. <br><br> MICROSOFT CORPORATION, <br><br>     Defendant. | CASE NO. 2:26-cv-01031 <br><br> **PLAINTIFF'S COMPLAINT – CLASS ACTION FOR DAMAGES** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, Austin Beaulier ("Plaintiff") brings this class action complaint ("Complaint") on behalf of himself and all others similarly situated (the "Class Members") against Microsoft Corporation, ("Defendant" or "Microsoft") for violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsels' investigation, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. This is a nationwide class action for violations of § 1202 of the Digital Millennium Copyright Act ("DMCA"). The case arises from Defendant's removal or failure to preserve machine-readable copyright management information ("CMI"), including: creator attribution and license

PLAINTIFF'S COMPLAINT - 1                                    **MILBERG, PLLC**

designation, associated with works created by independent artists and designers when those works were copied and processed for use in training large-scale generative artificial intelligence ("AI") systems.

2.     This action arises from the large-scale commercial exploitation of millions of digital three-dimensional ("3D") models created by independent artists and designers and shared online under Creative Commons licensing terms. These works were collected through automated web-crawling tools and aggregated into massive machine-learning datasets, including the widely used Objaverse-XL dataset, which contains more than ten million 3D assets sourced from publicly accessible repositories such as Sketchfab, Thingiverse, Polycam, and GitHub.

3.     These datasets were assembled by collecting millions of user-generated 3D models that individual creators uploaded to online repositories under various Creative Commons licenses. Those licenses permit reuse only under specific conditions established by the creators, including requirements that downstream users provide attribution, restrictions on commercial exploitation, limitations on derivative works, and other conditions governing the permitted use of the works.

4.     This case is not about challenging generative artificial intelligence research as a whole. Rather large technology companies may not ingest Creative Commons-licensed works into AI training pipelines and deploy the resulting generative systems in commercial products and platforms without complying with the license conditions that governed those works when they were originally published.

5.     Defendant's conduct follows a common structural pattern. First, individual creators upload original 3D models to online repositories such as Sketchfab and Thingiverse under Creative Commons license terms that preserve attribution rights and impose other conditions on reuse. Second, researchers and dataset curators aggregate links or directives to those models into large-scale training datasets such as Objaverse-XL. Third, commercial technology companies use those datasets to identify and download the 3D models. Fourth, commercial technology companies prepare and render the downloaded 3D models for ingestion into generative AI models while stripping the models of CMI. Finally, those models are integrated into monetized consumer and enterprise ecosystems, allowing companies to generate revenue from systems trained on the works of millions of creators.

PLAINTIFF'S COMPLAINT - 2                                             **MILBERG, PLLC**

6.      By ingesting Creative Commons-licensed works into commercial AI training pipelines without preserving attribution information, without complying with license conditions, and without authorization from the creators whose works were used, Defendant has exploited the openness of the online 3D-model community while disregarding the legal obligations that govern the reuse of those works.

7.      The conduct alleged here reflects a broader systemic practice in which commercial entities build generative AI systems by ingesting large-scale datasets derived from online creative communities while disregarding the licensing conditions governing those works.

8.      Importantly, the creators whose works were incorporated into these datasets are not anonymous or unknowable. Unlike certain web-scraping contexts in which the origin of training data is difficult to determine, the Objaverse-XL dataset itself preserves links to the original source files and creator accounts from which the models were obtained. This makes it possible to identify with precision the artists whose works were incorporated into the datasets used to train generative systems.

9.      The Copyright Clause of the United States Constitution empowers Congress to protect works of human creativity. These protections encourage creators to devote effort and resources to creative enterprises by providing confidence that their works will be shielded from unauthorized exploitation.

10.      In recognition that emerging technologies could be used to evade statutory protections, Congress enacted the Digital Millennium Copyright Act in 1998. Among other things, the DMCA prohibits the intentional removal or alteration of copyright management information associated with a protected work when the actor knows, or has reason to know, that doing so will induce, enable, facilitate, or conceal infringement.

11.      Plaintiff brings this action to enforce those rights and to ensure that creators whose works were incorporated into Defendant's generative AI systems are afforded the protections guaranteed by federal copyright law.

12.      Microsoft has played a central role in the development and dissemination of generative 3D model technology through its TRELLIS project. In building these systems, Microsoft has publicly acknowledged relying on large-scale datasets derived from Objaverse-XL and similar repositories,

PLAINTIFF'S COMPLAINT - 3                                              **MILBERG, PLLC**

including hundreds of thousands of 3D assets that were processed, rendered, and incorporated into its model training pipeline.

13.     As part of the TRELLIS initiative, Microsoft curated and released TRELLIS-500K, a dataset composed of approximately 500,000 3D assets drawn largely from Objaverse-XL. While intended to facilitate further research and development in generative 3D modeling, this dataset was released without critical CMI associated with the works when they were first published including licensing and attribution information, thereby obscuring the terms governing their use.

14.     Microsoft both used Objaverse-derived materials to train its own commercial generative models and created and distributed a derivative dataset designed to enable others to do the same. In each instance, the underlying works were processed into machine-learning inputs in a manner that did not preserve—or actively removed—CMI, including creator-identifying information, licensing terms, while also facilitating downstream use of those CMI stripped works by third parties.

### JURISDICTION AND VENUE

#### A. Jurisdiction

15.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Copyright Act of 1976, 17 U.S.C. § 101, et seq., as amended by the Digital Millennium Copyright, 17 U.S.C. § 1202 et seq.

16.     This Court has personal jurisdiction over because Defendant resides in this District, conducts substantial business in this District, and has purposefully directed the conduct alleged herein toward this District.

17.     Microsoft conducts substantial and continuous business within this District, including maintaining its corporate headquarters, offices, employing personnel, conducting research and development activities, and offering products and services throughout this District.

18.     Defendant has purposefully availed itself of the privilege of conducting business within this District and has derived substantial revenue from its activities directed at residents of this District and throughout the United States.

PLAINTIFF'S COMPLAINT - 4                                                    **MILBERG, PLLC**

**B. Venue**

19.    Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendant's headquarters is in Redmond Washington, in the Western District of Washington.

20.    Venue is further proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Defendant developed, trained, and/or deployed generative artificial intelligence systems within this District that were trained using datasets containing Plaintiff's copyrighted works and associated copyright management information.

21.    Defendant conducts substantial business in this District and regularly engages in interstate commerce within this District.

22.    Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because Defendant is subject to personal jurisdiction in this District.

## PARTIES

**A. Plaintiff**

23.    Plaintiff Austin Beaulier is an individual and a professional 3D artist, developer, and visual effects creator residing in the Los Angeles, California area.

24.    Plaintiff specializes in creating digital three-dimensional models, photogrammetry scans, and other visual assets used in animation, visual effects, virtual environments, and related digital media applications.

25.    Plaintiff has more than eight years of experience producing photorealistic 3D assets and working with advanced 3D modeling, scanning, and machine-learning technologies.

26.    Plaintiff publishes and distributes original 3D models and related digital works through online platforms used by the global 3D artist community, including repositories such as Sketchfab, CGTrader, Thingiverse, and Polycam and other digital asset platforms.

27.    Plaintiff owns the copyrights and other exclusive rights in his original 3D works that he created and published online.

PLAINTIFF'S COMPLAINT - 5                                    **MILBERG, PLLC**

28.     Plaintiff's original 3D works are included in Objaverse-XL and related derivative datasets, used to train Defendant's AI systems.

29.     Plaintiff brings this action individually and on behalf of a class of similarly situated creators whose 3D models and works were incorporated into large-scale AI training datasets used to train Defendant's generative AI systems.

### B. Defendant

30.     Defendant Microsoft Corporation is a corporation organized under the laws of the State of Washington with its headquarters in Redmond, Washington.

31.     Microsoft is a multinational technology company that develops software platforms, cloud computing services, and artificial intelligence systems used by businesses and consumers worldwide. Microsoft conducts substantial research and development involving generative artificial intelligence systems and has participated in the development, curation, and release of TRELLIS-500K, a large-scale dataset used to train generative AI models, derived from Objaverse-XL.

## FACTUAL ALLEGATIONS

### A. The Online 3D Model Creator Ecosystem

32.     Over the past two decades, a large online ecosystem has emerged in which artists, designers, engineers, hobbyists, and developers create and share digital 3D models. These models are used across numerous industries and creative fields, including video game development, animation, virtual and augmented reality environments, product design, architecture, robotics, and additive manufacturing.

33.     A substantial portion of this ecosystem operates through public repositories that allow creators to upload and distribute their works to others. These repositories include platforms such as Sketchfab, Thingiverse, Polycam, and other web-based archives that host user-generated 3D content.

34.     These platforms collectively host millions of digital 3D models representing a wide range of objects, including characters, vehicles, architecture, mechanical components, and natural environments. Individual creators invest substantial time, skill, and creative effort into producing these models using specialized design tools and software.

PLAINTIFF'S COMPLAINT - 6                                        **MILBERG, PLLC**

35.    The online ecosystem for sharing and distributing digital 3D models has thus developed around open licensing frameworks that allow creators to share their work while retaining specifically defined legal rights.

36.    Many creators choose to share their works publicly in order to contribute to collaborative design communities, build professional portfolios, and allow other artists and developers to reuse their work in legitimate creative projects.

37.    To facilitate lawful sharing while preserving creators' rights, these platforms commonly require creators to select a license governing how their work may be reused by others. In the 3D-modeling ecosystem, those licenses are frequently Creative Commons licenses. The models identified through datasets such as Objaverse-XL are not governed by a single uniform license.

38.    These Creative Commons licenses serve two complementary purposes. First, they allow creators to share their work freely with the broader community in the spirit of collaborative creativity and open innovation. Second, they preserve core protections that allow creators to maintain recognition and control over how their works are reused.

39.    In general, Creative Commons licenses commonly require downstream users to comply with obligations such as providing attribution to the creator, refraining from commercial exploitation, or distributing derivative works under the same licensing terms.

40.    More specifically, where works are licensed under CC-BY(Attribution), the work may be reused provided that the original creator receives proper credit. CC-BY 4.0 requires that attribution information associated with the work be preserved and communicated when the work is reproduced or reused. Where works are licensed under CC-BY-NC (Non-Commercial), commercial use is prohibited. Where works are licensed under CC-BY-SA, derivative works must be distributed under the same licensing terms as the original work. Each of these licenses imposes distinct obligations on downstream users of the work.

41.    Importantly, these licenses operate on a per-work basis. When a creator uploads a model to platforms such as Sketchfab or Thingiverse, the creator selects the specific license governing that

PLAINTIFF'S COMPLAINT - 7                                    **MILBERG, PLLC**

particular work. As a result, two models hosted on the same platform may be subject to entirely different licensing conditions depending on the choices made by their creators.

42. Because these requirements are attached on a work-by-work basis, users of large collections of 3D models must preserve and track attribution, license designations, and related CMI for each individual asset if they intend to comply with the governing terms.

43. This structure presents significant compliance challenges. When a system relies on hundreds of thousands or millions of individual models originating from multiple platforms and governed by different license terms, compliance with attribution and licensing requirements requires tracking and preserving CMI on a per-work basis.

44. Upon information and belief, Defendant did not maintain a system capable of tracking, preserving, and reproducing the attribution and licensing information required by these licenses on a per-work basis throughout the process by which the works were copied, converted, rendered, normalized, and ingested into AI training inputs.

45. Defendant's practices made compliance with the licensing requirements governing those works effectively impossible. For example, where a work was licensed under CC-BY or CC-BY 4.0, the license required that the user provide attribution to the creator when the work was reproduced, distributed, or otherwise used. Yet Defendant's training pipeline incorporated large numbers of works into machine-learning systems without preserving the identity of the creators or the licensing information associated with each work.

46. Where works were licensed under terms that restrict commercial exploitation—including CC-BY-NC—using those works to train commercial generative AI systems exceeded the scope of the license granted by the creator.

47. Similarly, where works were licensed under share-alike provisions such as CC-BY-SA, the use of those works in downstream generative systems raised further obligations that Defendant did not attempt to satisfy.

PLAINTIFF'S COMPLAINT - 8                                    **MILBERG, PLLC**

48.     Defendant's conduct alleged herein created a substantial certainty that works subject to restrictive licensing conditions would be copied, processed, and used in AI training systems without authorization and without compliance with the terms governing those works.

49.     Defendant's practices undermined the licensing framework that has enabled the collaborative development of the online 3D-model ecosystem.

## B. Sketchfab's NoAI Designation as Copyright Management Information

50.     Sketchfab is a widely used online platform that allows creators to upload, publish, and distribute digital 3D models for use in video games, animation, virtual reality, engineering, and other digital media applications. The platform hosts millions of user-generated 3D models created by artists, designers, engineers, and hobbyists who share their works with the broader creative community.

51.     Sketchfab requires creators who make models available for free download to select a Creative Common license governing the work.

52.     In February 2023, in response to growing concerns within the artist community regarding the use of online artwork to train generative artificial intelligence systems, Sketchfab introduced a platform feature known as the "NoAI" tag.

53.     The NoAI tag allows creators to designate that their models may not be used for generative AI data collection, dataset creation, or AI model training.

54.     When a creator applies the NoAI designation to a model, Sketchfab embeds a corresponding HTML meta tag within the model's webpage indicating that the work is disallowed for use in generative AI datasets or training pipelines. This tag functions as a machine-readable signal that can be detected by automated tools accessing the platform.

55.     In other words, the NoAI designation is implemented through machine-readable metadata embedded in the model's webpage and associated platform data. This metadata is designed to be detected by automated systems accessing the platform and communicates that the work may not be used in generative AI datasets or training pipelines.

56.     Sketchfab simultaneously updated its platform policies and terms of use to reinforce the significance of this designation. Under those terms, users are prohibited from using models marked with

PLAINTIFF'S COMPLAINT - 9                                        **MILBERG, PLLC**

the NoAI tag in datasets used for developing or training generative AI systems, in the development of such systems, or as inputs into such systems.

57. The platform does not apply the NoAI designation automatically. Instead, creators must actively choose to apply the tag to their projects. This design reflects that the tag represents a deliberate decision by the creator to impose a specific restriction governing the use of the work.

58. The NoAI designation therefore operates as a creator-imposed restriction governing how a particular work may be used. When applied, it communicates that the creator has expressly withheld permission for the work to be incorporated into AI training datasets or similar automated data-collection systems.

59. This designation of the type of Creative Common license constitutes CMI within the meaning of 17 U.S.C. § 1202(c). Specifically, the NoAI tag falls under § 1202(c)(6), which covers "terms and conditions for use of the work." By designating a model as NoAI, the creator attaches a specific usage restriction to the work indicating that it may not be used for AI training purposes.

60. Functionally, the NoAI designation operates in the same manner as other forms of digital rights-management information, such as embedded license notices, copyright metadata, or digital watermarks that communicate restrictions on the use of copyrighted works.

61. In copying, converting, and preprocessing the works for use in machine-learning training pipelines, Defendant removed, failed to preserve, or disregarded the NoAI tag.

62. Accordingly, the removal, alteration, or disregard of the NoAI designation in connection with copying, downloading, processing, or ingesting Sketchfab models into AI training pipelines constitutes the removal or alteration of copyright management information within the meaning of 17 U.S.C. § 1202.

**C. Copyright Management Information in the 3D Model Ecosystem**

63. The works created by Plaintiff and members of the proposed Class were originally distributed on platforms such as Sketchfab, Thingiverse, and Polycam together with creator-identifying information, licensing information, attribution requirements, and other information governing the permitted use of the works.

PLAINTIFF'S COMPLAINT - 10                                    **MILBERG, PLLC**

64. This information commonly includes the title of the work, the identity of the creator, links to the creator's account or portfolio, the type of Creative Common license governing how the work may be used, and associated terms or conditions communicated on the platform page or in associated metadata fields.

65. These data fields constitute CMI within the meaning of the DMCA. Section 1202(c) defines CMI broadly to include, among other things, the title and identifying information of a work, the name and identifying information of the author or copyright owner, and the terms and conditions governing the use of the work.

66. The licensing designations attached to models hosted on platforms—including Creative Commons license selections—therefore constitute CMI because they communicate the terms and conditions under which the work may be reused.

67. This information, including the creator's identity and the terms governing reuse, is commonly conveyed through metadata attached to the work.

**D. Registration Is Not Required for Plaintiff's DMCA Claims**

68. Plaintiff and the members of the proposed Class are creators who design, author, and publish original digital 3D models on online platforms. These creators retain copyright interests in their works and routinely distribute their models publicly through these platforms, accompanied by creator attribution information and other CMI identifying the author of the work.

69. A significant portion of these creators, however, have not formally registered their works with the United States Copyright Office. This is consistent with the norms of the online 3D-modeling community, where individual creators frequently publish original works for download, collaboration, or portfolio display without undertaking the administrative burden and expense associated with federal copyright registration.

70. Defendant's conduct nevertheless gives rise to liability under Chapter 12 of the Copyright Act regardless of whether Plaintiff's works were registered. Claims arising under 17 U.S.C. § 1202 constitute independent statutory violations separate and distinct from claims for direct copyright infringement.

**MILBERG, PLLC**

71. Unlike infringement claims under 17 U.S.C. § 501, which are subject to the registration prerequisite of 17 U.S.C. § 411(a), causes of action under Chapter 12 do not require a plaintiff to obtain a prior copyright registration before bringing suit.

72. Defendant's conduct injured Plaintiff and the proposed Class by interfering with the statutory protections afforded to creators under Chapter 12 of the Copyright Act, including protections designed to preserve attribution information and safeguard digital works from unauthorized copying, processing, and downstream exploitation.

73. As a result, Defendant cannot evade liability for its violations of 17 U.S.C. § 1202 merely because the affected creators had not registered their works with the Copyright Office.

### E. Objaverse-XL and Related Datasets

74. In recent years, researchers and technology companies have assembled large-scale datasets of 3D models in order to train artificial intelligence systems capable of generating new 3D content.

75. One of the most widely used datasets for this purpose is Objaverse, and its expanded successor Objaverse-XL, which was released in 2023.

76. Objaverse-XL is an academic dataset composed of more than 10 million 3D assets collected from publicly accessible repositories containing user-generated 3D models.

77. The dataset aggregates models from numerous online platforms, including Sketchfab, Thingiverse, Polycam, GitHub, and other repositories where creators publish and distribute digital 3D assets.

78. Because the source platforms allow creators to select licensing terms for each individual model, the assets referenced in Objaverse-XL are associated with a wide variety of Creative Commons licenses and other usage restrictions imposed by the creators who authored those works.

79. Objaverse-XL preserves references to the original source files, source repositories, and creator accounts from which the models were obtained. These links allow researchers and downstream users to trace assets back to the platform and creator from which they originated. By contrast, Defendant's

PLAINTIFF'S COMPLAINT - 12            **MILBERG, PLLC**

curated training datasets and generative systems do not retain or communicate that information, thereby severing the connection between the work and the creator.

80. The existence of these links makes it possible to identify the individual artists and designers whose works were incorporated into or referenced by the dataset—which is important for attribution.

81. In addition to Objaverse-XL itself, derivative datasets have been created using subsets of the assets it references. One such dataset is TRELLIS-500K, a curated collection of approximately 500,000 3D assets derived from Objaverse-XL and designed for training generative 3D models.

82. These datasets have been used by commercial technology companies to train foundation-scale generative models capable of automatically producing new 3D objects, environments, and digital assets.

83. Once trained, these systems can produce new 3D assets through automated prompts or programmatic interfaces and can be integrated into commercial platforms, developer tools, and enterprise software systems.

84. Several major technology companies—including Microsoft—have publicly disclosed using datasets derived from Objaverse-XL or TRELLIS-500K to train generative 3D models that are incorporated into commercial products, research initiatives, or developer ecosystems.

85. Datasets such as Objaverse-XL function as a structured index of publicly hosted 3D models, preserving references to the online repositories where those works were originally published.

86. Repositories, such as Sketchfab, Thingiverse, Polycam, GitHub, and others, distribute creator-uploaded models together with CMI, including the creator's identity, licensing terms, attribution requirements, and other information governing the permitted use of the work.

87. Upon information and belief, Defendant used Objaverse-derived datasets as a source map to identify and obtain copies of 3D models. After obtaining those works, Defendant copied, converted, rendered, normalized, and otherwise processed the models through machine-learning preprocessing pipelines. In the course of that process, the creator-identifying information, licensing metadata, and other CMI that accompanied the works when originally distributed were removed, failed to be preserved, or

PLAINTIFF'S COMPLAINT - 13                                                                 **MILBERG, PLLC**

otherwise disregarded, resulting in the use of CMI-stripped representations of Plaintiff's works within Defendant's AI training datasets.

88.    As a result, the representations of Plaintiff's and class members' works used within Defendant's generative AI training systems no longer contained the attribution, licensing information, or other copyright management information associated with those works when they were originally distributed.

### F.  Defendant's Use of Plaintiff's Works for AI Training and Failure to Preserve CMI

89.    Large technology companies, such as Defendant, have incorporated Objaverse, Objaverse-XL and Objaverse-derived datasets into the training pipelines for commercial generative artificial intelligence systems designed to create new 3D models and digital environments.

90.    Upon information and belief, Defendant trained its generative 3D systems using assets drawn from Objaverse-XL or derivative subsets of that dataset, including, the TRELLIS-500K dataset.

91.    The conduct alleged in this action follows a consistent technological pipeline through which Defendant identified, obtained, and processed Plaintiff's works for use in generative artificial intelligence training systems.

92.    First, individual creators—including Plaintiff and members of the proposed Class—published original 3D models on online repositories such as Sketchfab, Thingiverse, and Polycam. When those works were distributed on those platforms, they were accompanied by CMI, including the creator's identity, the title of the work, licensing terms governing reuse, attribution requirements, and other information identifying the conditions under which the work could be used.

93.    Second, researchers compiled datasets such as Objaverse-XL, which aggregate references to millions of these models and preserved source information sufficient to identify the online repositories where the works were hosted. These datasets functioned as a structured index that enabled downstream users to locate the underlying works on the platforms where they were originally published. These datasets also contain metadata identifying the Creative Common license, and other terms of use, associated with the work.

PLAINTIFF'S COMPLAINT - 14                                    **MILBERG, PLLC**

94.     Third, commercial entities use those datasets as a source map to identify and obtain the referenced 3D assets from the online repositories where those works were originally hosted.

95.     Fourth, and most importantly, after obtaining copies of the works, Defendant processed the models through machine-learning preprocessing pipelines designed to convert raw 3D assets into training inputs suitable for generative AI systems.

96.     Training generative artificial intelligence systems requires converting raw creative works into machine-learning representations that can be processed by neural networks.

97.     In the context of 3D generative models, this process involves transforming raw 3D asset files into numerical or visual representations that can be used as training inputs.

98.     This preprocessing typically includes operations such as format conversion, mesh normalization, rendering, voxelization, and other transformations designed to convert the geometry and textures of a 3D model into data structures suitable for machine-learning training.

99.     During these transformations, the creative content of the work—such as its geometry, structure, textures, and visual features—is preserved in numerical or visual form so that the model can learn patterns from the training data.

100.    However, during this process, the works are separated from the attribution information, licensing terms, and other CMI that accompanied the works when they were originally distributed on their source platforms.

101.    Thus, the creator-identifying information, licensing metadata, attribution requirements, and other CMI that accompanied the works when originally distributed were removed, failed to be preserved, or otherwise disregarded.

102.    As a result, once a work has been converted into machine-learning training inputs, it is no longer possible for the training system itself to identify the creator of the work or to comply with the attribution requirements or licensing conditions associated with that work.

103.    This separation between the creative content of a work and the CMI that accompanied it is a foreseeable and inherent consequence of using large-scale creative datasets to train generative artificial intelligence systems.

PLAINTIFF'S COMPLAINT - 15                                          **MILBERG, PLLC**

104.    Defendant knew or had reasonable grounds to know that the preprocessing pipelines used to train its generative AI systems would separate the creative content of the works from the CMI that accompanied those works when they were originally distributed.

105.    Finally, Defendant used these CMI-stripped representations of Plaintiff's works as inputs to train generative AI systems capable of producing new 3D objects, environments, and digital assets, and integrated those systems into commercial products, developer platforms, and enterprise technologies.

106.    Through this process, Defendant uses Plaintiff's works as inputs to train generative AI systems capable of producing new 3D content but without the necessary creator-identifying information, license terms, or other CMI associated with those works.

107.    As a result, Defendant exploited Plaintiff's copyrighted works to train commercial AI systems after removing, failing to preserve, or disregarding the copyright management information associated with those works.

**G. Defendant's Commercial Use of Objaverse-Derived Datasets in Generative 3D Systems**

108.    Defendant Microsoft released its TRELLIS model in December 2024, and subsequently released its TRELLIS-500K dataset later that month. Microsoft released a major updated version of TRELLIS called TRELLIS.2 in December 2025.

109.    Microsoft has disclosed training generative 3D models using assets derived from Objaverse-XL and related datasets. For example, Microsoft publicly disclosed that it collected approximately 500,000 high-quality 3D assets from public datasets including Objaverse-XL, rendered 150 images per asset, and used those assets to train its generative 3D models. Microsoft thus did not merely rely on generalized public material; it specifically identified Objaverse-XL as a principal component of the training data used in its 3D generation pipeline.

110.    Microsoft's conduct went further still. As part of its TRELLIS project, Microsoft curated and publicly released TRELLIS-500K, a filtered subset derived substantially from Objaverse-XL. Microsoft's release of TRELLIS-500K in December 2024 omits the per-file license information that

PLAINTIFF'S COMPLAINT - 16                                              **MILBERG, PLLC**

Objaverse-XL's authors had preserved, thereby reducing downstream visibility into the original licensing conditions attached to each mesh.

111.    Thus, in addition to consuming Objaverse-derived asset pools for its own research and development, Microsoft curated and publicly released a derivative dataset (TRELLIS-500K), which was designed to facilitate the training of other generative 3D models by providing a curated body of assets suitable for machine-learning research and development.

112.    Accordingly, Microsoft is alleged to have acted in two related roles. First, Microsoft used Objaverse-derived works to train its own generative 3D systems (TRELLIS and TRELLIS.2) after copying, rendering, and preprocessing those works into machine-learning inputs that no longer preserved the creator-identifying information, license terms, NoAI-related restrictions, and other CMI originally associated with the works. Second, by curating and redistributing TRELLIS-500K without the per-file license information preserved in Objaverse-XL, Microsoft materially facilitated downstream use of those same works by other commercial actors in a form stripped of important rights-management information.

**H.  Plaintiff Suffered Harm and Concrete Injury**

113.     As a professional artist and creator of photogrammetry-based[1] 3D models, Plaintiff has invested substantial time, skill, and financial resources in developing his professional practice.

114.    These investments include professional-grade camera equipment, drones, specialized computing hardware capable of processing large photogrammetry datasets, and licensed software used to reconstruct and refine three-dimensional models from Plaintiff's original photographic inputs. Plaintiff has also invested substantial time and labor in capturing imagery, processing scans, editing meshes and textures, and preparing models for distribution on online platforms.

115.    Since approximately 2018, Plaintiff has created and published hundreds of original 3D models through various online platforms used by the global 3D artist community. These platforms include Sketchfab, CGTrader, Thingiverse, and Polycam.

---

[1] Photogrammetry is a specialized technique that involves capturing large numbers of high-resolution photographs of real-world objects and environments and processing those images through specialized software in order to reconstruct accurate digital three-dimensional assets.

PLAINTIFF'S COMPLAINT - 17                                                    **MILBERG, PLLC**

116. On Sketchfab alone, Plaintiff has published more than four hundred original 3D models which are displayed and distributed through an integrated online viewer that allows users to evaluate the models. Plaintiff's models have collectively received more than 600,000 views on Sketchfab alone. At the time Plaintiff published his models on Sketchfab, he conveyed his restrictions on their use with the CC-BY (attribution) Creative Commons license.

117. Plaintiff's professional practice has historically depended on public visibility of his published works. Plaintiff used Sketchfab as a central portfolio through which potential clients—including artists, developers, and commercial entities—could discover his work, evaluate its quality, and engage him for purchase, licensing opportunities, or additional freelance projects.

118. Prior to the emergence of generative artificial intelligence systems trained on large-scale 3D datasets identified herein, Plaintiff regularly received economic opportunities from this portfolio-based model. Plaintiff sold and licensed models through the Sketchfab marketplace and other platforms and used his publicly available work to obtain freelance opportunities in visual effects and related fields. For example, Plaintiff was engaged to perform 3D scanning work for artistic and commercial projects after clients discovered his work through his online Sketchfab portfolio.

119. In addition to publishing models for portfolio visibility and community collaboration, Plaintiff has also monetized his work through licensing and marketplace sales. Plaintiff has sold and licensed his models through digital asset marketplaces such as CGTrader and through Sketchfab's integrated marketplace. Plaintiff has also negotiated direct licenses with companies seeking to incorporate his models into their own digital products and services.

120. Attribution plays a critical role in Plaintiff's ability to generate income from his work. Plaintiff's use of Creative Commons attribution licenses was intended to allow his models to be shared while ensuring that his identity remained associated with the works, thereby enabling prospective clients to locate his portfolio and engage him for paid opportunities. Plaintiff has, in fact, received professional credit for his work, including attribution in connection with third-party projects, which contributes to his reputation and visibility within the industry.

PLAINTIFF'S COMPLAINT - 18                    **MILBERG, PLLC**

121.    Recognizing the importance of this attribution-based model, Plaintiff has in the past actively pursued unlawful redistribution and copying of his work, including by issuing Digital Millennium Copyright Act takedown notices after discovering that third parties had reproduced or redistributed his models without permission.

122.    Plaintiff has also utilized tools available on hosting platforms, such as Sketchfab, designed to communicate restrictions on the use of his works in automated data collection or artificial intelligence systems.

123.    For example, shortly after Sketchfab introduced a "NoAI" designation in February 2023, Plaintiff manually applied the NoAI tag to each of the more than four hundred models published on the site. This action reflected Plaintiff's explicit decision to prohibit the use of his works for generative AI training purposes.

124.    Despite these steps, shortly after applying the NoAI designation on his works hosted on Sketchfab, Plaintiff discovered that his works were referenced within the Objaverse dataset. The website hosting the Objaverse dataset provided tools allowing creators to search for models associated with their accounts. Using those tools, Plaintiff located numerous works of his within the dataset.

125.    Plaintiff raised concerns regarding this issue with individuals at Sketchfab and publicly objected to the inclusion of his works within AI-related datasets despite the NoAI restrictions he had applied to his models. Plaintiff was informed that Sketchfab had limited ability to prevent entities from copying and using the models once they had been indexed or collected by third-party datasets.

126.    As a result of these developments, Plaintiff took steps to restrict access to his works. Plaintiff removed the free-download availability of his models and moved many of his works into the paid marketplace in an effort to prevent further ingestion of his works into AI training datasets. This shift has reduced the visibility and accessibility of Plaintiff's work within the broader creative community and has thus diminished the portfolio-driven exposure that previously generated business opportunities.

127.    The events described above have also had a significant personal impact on Plaintiff. Upon learning that his works had been incorporated into datasets used to train generative artificial intelligence systems, against his explicit wishes, Plaintiff felt that the value of his creative labor had been appropriated

PLAINTIFF'S COMPLAINT - 19                                              **MILBERG, PLLC**

without permission. Plaintiff experienced a loss of creative motivation to continue producing and sharing new models at the pace he had previously maintained. As a result, Plaintiff reduced the frequency with which he created and uploaded new works.

128.    Taken together, Defendant's conduct of removing, failing to preserve, or disregarding CMI—including attribution and licensing terms—interferes directly with the attribution-based economic model for Plaintiff and Class Members. Defendant has undermined the licensing framework that governed Plaintiff's models and interfered with Plaintiff's and Class Member's ability to control how their works are used, attributed, and monetized.

129.    Defendant's conduct has therefore diminished the value of Plaintiff's creative works, disrupted the market for licensing 3D assets, and interfered with Plaintiff's ongoing efforts to build and sustain a professional practice based on the creation and licensing of digital 3D models.

## CLASS ACTION ALLEGATIONS

130.    **Class Definition:** Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as follows:

> All creators whose 3D models with CMI were published on Sketchfab, Thingiverse, Polycam, or other repositories and were incorporated into Objaverse-XL or derivative datasets used by Defendant to train its AI models.

131.    Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

132.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

133.    Excluded from the Class are Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

PLAINTIFF'S COMPLAINT - 20                                          **MILBERG, PLLC**

134. Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable. Datasets such as Objaverse-XL preserve certain metadata, including references to the original source repositories and model URLs from which the assets were collected, enabling the models referenced in the dataset to be traced back to the specific platform pages where the works were hosted. Those platform pages identify the creator of the work. As a result, the creators whose works were referenced in Objaverse-derived datasets—including Plaintiff and members of the proposed Class—can be identified through systematic analysis of the dataset metadata and the corresponding source repositories.

135. Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff's 3D Models were included in the datasets used by Defendant in the training of Defendant's AI models. Defendant trained commercial generative AI systems on Plaintiff's 3D models after removing the copyright management information that accompanied those works. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

136. Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests coincide with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

137. Common Questions of Law and Fact Predominate. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

(a) Whether Defendant used datasets derived from Objaverse-XL, TRELLIS-500K, or related datasets to identify and obtain 3D models created by Plaintiff and members of the Class.

PLAINTIFF'S COMPLAINT - 21                    **MILBERG, PLLC**

(b)    Whether the works created by Plaintiff and members of the Class were originally distributed on platforms such as Sketchfab, Thingiverse, or Polycam together with copyright management information, including creator attribution, licensing terms, and conditions governing reuse.

(c)    Whether the information accompanying those works—including creator identity, license designations, attribution requirements, and related metadata—constitutes copyright management information under 17 U.S.C. §1202.

(d)    Whether Defendant copied or obtained Plaintiff's works for use in training generative artificial intelligence systems.

(e)    Whether, in the course of copying, converting, rendering, preprocessing, or ingesting those works into its AI training pipeline, Defendant removed, altered, or failed to preserve the copyright management information associated with those works.

(f)    Whether Defendant knew, or had reasonable grounds to know, that the removal or failure to preserve copyright management information would induce, enable, facilitate, or conceal infringement within the meaning of 17 U.S.C. §1202(b).

(g)    Whether Defendant's conduct violated 17 U.S.C. §1202.

(h)    Whether Plaintiff and Class members are entitled to declaratory and injunctive relief requiring Defendant to cease training its commercial generative AI systems using Plaintiff's works which it stripped of copyright management information and to implement compliance measures sufficient to prevent further violations.

(i)    Whether Plaintiff and Class members are entitled to statutory damages (including the appropriate statutory measure and amount) under 17 U.S.C. § 1203(c) based on Defendant's violations of 17 U.S.C. § 1202.

138.    Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining

PLAINTIFF'S COMPLAINT - 22                                    **MILBERG, PLLC**

redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Digital Millennium Copyright Act
### 17 U.S.C. § 1202(b)(1)
### (Removal of Copyright Management Information)

139.   Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

140.   Plaintiff and members of the proposed Class are creators of original 3D models that are distributed on public repositories including, but not limited to, Sketchfab, Thingiverse, and Polycam.

141.   When distributed on those platforms, the works were accompanied by copyright management information ("CMI"), including the creator's identity, the title of the work, licensing terms governing reuse, attribution requirements, and other information identifying the conditions under which the work could be used.

142.   This information constitutes copyright management information within the meaning of 17 U.S.C. §1202(c).

143.   Defendant used datasets derived from Objaverse-XL, TRELLIS-500K, or related datasets to identify and obtain copies of Plaintiff's and Class members' works from the repositories where those works were originally hosted.

144.   Defendant then copied and processed those works through machine-learning preprocessing pipelines designed to convert raw 3D assets into inputs suitable for training generative artificial intelligence systems.

145.   These preprocessing operations—including format conversion, mesh normalization, rendering, voxelization, and related transformations—separate the expressive content of the work from the attribution information, licensing metadata, and other CMI associated with the work when originally distributed.

PLAINTIFF'S COMPLAINT - 23                                          **MILBERG, PLLC**

146. Through this process, Defendant intentionally removed, altered, or caused the removal or alteration of CMI associated with the works, including creator attribution, licensing terms, and other identifying information.

147. Defendant then incorporated these CMI-stripped representations of Plaintiff's works into the training datasets used to develop its generative artificial intelligence systems.

148. Defendant knew, or had reasonable grounds to know, that the works referenced in Objaverse-XL originated from platforms such as Sketchfab, Thingiverse, and Polycam that distribute user-generated models together with creator attribution, license designations, and other CMI governing downstream use.

149. Defendant further knew, or had reasonable grounds to know, that the preprocessing pipelines used to train generative AI systems do not preserve such CMI and instead produce normalized representations of the works that omit attribution, licensing metadata, and other rights-management information.

150. By removing or failing to preserve this information during the training process, Defendant ensured that neither the resulting AI systems nor their users could identify the creators of the underlying works or comply with the license conditions governing those works, including attribution requirements and restrictions on commercial use.

151. Defendant therefore knew, or had reasonable grounds to know, that the removal or alteration of CMI would induce, enable, facilitate, or conceal infringement of Plaintiff's and Class members' works.

152. As a direct and proximate result of Defendant's conduct, Plaintiff and members of the proposed Class have suffered injury.

153. Each work from which CMI was removed or altered constitutes a separate violation of 17 U.S.C. §1202(b)(1).

154. Pursuant to 17 U.S.C. §1203, Plaintiff and the Class are entitled to recover actual damages and Defendant's profits attributable to the violations, or statutory damages for each violation, together with costs and attorneys' fees.

155. Plaintiff and the Class are further entitled to injunctive and equitable relief prohibiting Defendant from continuing to remove, alter, or distribute works from which copyright management information has been removed.

## COUNT II
### Violation of the Digital Millennium Copyright Act
### 17 U.S.C. § 1202(b)(3)
### (Distribution or Use of Works Knowing CMI Has Been Removed)

156. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

157. Section 1202(b)(3) prohibits any person from distributing, importing for distribution, or otherwise using copyrighted works knowing that copyright management information has been removed or altered without authority.

158. As described above, Plaintiff's and Class members' works were originally distributed together with CMI identifying the creator of the work, the title of the work, and the licensing terms governing reuse.

159. This information constitutes CMI within the meaning of 17 U.S.C. §1202(c).

160. Defendant used datasets derived from Objaverse-XL, TRELLIS-500K, or related datasets to identify and obtain copies of Plaintiff's works from the repositories where those works were originally hosted.

161. In the course of copying, converting, rendering, normalizing, and otherwise preprocessing those works for use in AI training pipelines, the CMI associated with the works was removed, altered, or failed to be preserved.

162. Defendant thereafter used, distributed, and incorporated these CMI-stripped representations of Plaintiff's works within the training datasets used to develop its generative artificial intelligence systems.

163. Defendant knew, or had reasonable grounds to know, that the CMI associated with those works had been removed or altered without the authority of the copyright owners.

PLAINTIFF'S COMPLAINT - 25                                                    **MILBERG, PLLC**

164. Defendant further knew, or had reasonable grounds to know, that the use of works from which CMI had been removed would induce, enable, facilitate, or conceal infringement of Plaintiff's and Class members' works.

165. By using and incorporating these works into its generative AI training datasets and systems, Defendant violated 17 U.S.C. §1202(b)(3).

166. As a direct and proximate result of Defendant's conduct, Plaintiff and members of the proposed Class have suffered injury.

167. Pursuant to 17 U.S.C. §1203, Plaintiff and the Class are entitled to recover actual damages and Defendant's profits attributable to the violations, or statutory damages for each violation, together with costs and attorneys' fees.

168. Plaintiff and the Class are further entitled to injunctive and equitable relief prohibiting Defendant from continuing to use or distribute works from which copyright management information has been removed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that the Court grant the following relief:

(a) Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

(b) A declaration that Defendant violated 17 U.S.C. § 1202(b)(1) and § 1202(b)(3) by intentionally removing or altering copyright management information associated with Plaintiff's and Class Members' works and by distributing, using, or incorporating works knowing that such copyright management information had been removed or altered;

(c) Entry of injunctive relief requiring Defendant to cease removing, altering, or failing to preserve copyright management information from works obtained for use in generative artificial intelligence training systems;

PLAINTIFF'S COMPLAINT - 26                                          **MILBERG, PLLC**

(d)    Entry of injunctive relief prohibiting Defendant from distributing, using, or incorporating into artificial intelligence training datasets any works from which copyright management information has been removed or altered in violation of the DMCA;

(e)    An order requiring Defendant to identify and account for the works of Plaintiff and members of the Class that were incorporated into datasets or training pipelines used to develop Defendant's generative artificial intelligence systems;

(f)    Entry of injunctive relief requiring Defendant to preserve copyright management information associated with works used in future AI training datasets and to implement compliance measures sufficient to prevent further violations of 17 U.S.C. § 1202;

(g)    An award of statutory damages and/or actual damages and Defendant's profits attributable to the violations pursuant to 17 U.S.C. § 1203;

(h)    An award of Plaintiff's and the Class's reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 1203(b)(5);

(i)    Pre- and post-judgment interest as permitted by law; and

(j)    Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

Dated this 26th day of March, 2026:         Respectfully Submitted,

/s/ Douglas H. Sanders
Douglas H. Sanders
**MILBERG, PLLC**
1420 Fifth Ave, Suite 2200
Seattle, WA 98101
Tel: (516) 206-7616
dsanders@milberg.com

Gary M. Klinger (*pro hac vice* forthcoming)
William J. Edelman (*pro hac vice* forthcoming)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel: (866) 252-0878

gklinger@milberg.com
wedelman@milberg.com

Michael A. Acciavatti (*pro hac vice* forthcoming)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
macciavatti@milberg.com

*Attorneys for Plaintiff and Proposed Class*