The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

AUSTIN BEAULIER, individually and on behalf of those similarly situated,

Plaintiff,

v.

MICROSOFT CORPORATION,

Defendant.

Case No. 2:26-cv-01031-JNW

**DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITIES**

Pursuant to Civil Local Rule 7(n), Microsoft respectfully submits this Notice of Supplemental Authority to bring to the Court's attention relevant judicial opinions published after the date of Microsoft's reply brief in support of its pending motion to dismiss, Dkt. 24.

On August 26, 2026, Judge Charles R. Breyer granted a motion to dismiss Plaintiff Austin Beaulier's DMCA claims in an action he brought against Meta. *See Beaulier v. Meta Platforms*, No. 3:26-cv-02632-CRB, Dkt. 32 (N.D. Cal. Aug. 26, 2026). A copy of the order on the motion to dismiss is attached as Exhibit A.

On August 21, 2026, the Fifth Circuit issued its opinion in *Kipp Flores Architects, LLC v. AMH Creekside Development, LLC*, --- F.4th ----, No. 23-50750, 2026 WL 2453096 (5th Cir. Aug. 21, 2026). A copy of the opinion, which discusses the text of 17 U.S.C. § 1202(b) at 34-39, is attached as Exhibit B.



ORRICK, HERRINGTON & SUTCLIFFE LLP
401 Union Street, Suite 3300
Seattle, Washington 98101
+1 206 839 4300

Dated: August 31, 2026

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *Mark S. Parris*

Mark S. Parris (WSBA No. 13870)
Deirdre Farrell (WSBA No. 61977)
401 Union Street, Suite 3300
Seattle, WA 98101
T: 206.839.4300
F: 206.839.4301
mparris@orrick.com
Deirdre.Farrell@orrick.com

Christopher Cariello (*pro hac vice*)
51 West 52nd Street
New York, NY 10019
T: 212.506.3778
ccariello@orrick.com

Annette Louise Hurst (*pro hac vice*)
Amanda H. Schwartz (*pro hac vice*)
405 Howard Street
San Francisco, CA 94105
T: 206.773.5000
ahurst@orrick.com
aschwartz@orrick.com

*Attorneys for Defendant Microsoft Corporation*

# EXHIBIT A

United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AUSTIN BEAULIER,<br>Plaintiff,<br>v.<br>META PLATFORMS, INC.,<br>Defendant. | Case No. 26-cv-02632-CRB<br><br>**ORDER GRANTING MOTION TO DISMISS** |

This putative class action arises from Meta's alleged use of copyrighted three-dimensional (3D) models to train generative artificial intelligence systems. Plaintiff Austin Beaulier is a professional 3D artist who creates digital models and photogrammetry scans and publishes them on online repositories, including Sketchfab, Thingiverse, and Polycam. Compl. (dkt. 1) ¶¶ 24–27. He brings claims under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202(b). His theory is that Meta stripped identifying and licensing information from his works while preparing them for use in training Meta's AI models. Id. ¶¶ 1, 15.

For the reasons set forth below, the Court **GRANTS** Defendant's motion to dismiss, with **LEAVE TO AMEND**.

## I. BACKGROUND

Plaintiff alleges that he is a member of a larger class of individual artists and creators who publish their original 3D models online under Creative Commons licenses, which permit reuse only under stated conditions set on a "work-by-work" or "per-work" basis. Compl. ¶¶ 33–43. Typically, Creative Commons licenses require attribution to the original creator, and in some cases impose restrictions on commercial use of the work or

require that derivative works carry the same license. Id. ¶ 40. Beaulier published more than 400 original 3D models on Sketchfab alone, under the "CC-BY (attribution) Creative Commons" license. Id. ¶ 116. The complaint alleges that the underlying information accompanying these works, including creator identity, title, license terms, and attribution requirements, is copyright management information ("CMI") within the meaning of 17 U.S.C. § 1202(c). Id. ¶¶ 64–67. The complaint separately relies on a Sketchfab feature known as the "NoAI" tag, which allows creators to designate that their work may not be used for AI data collection or model training. Id. ¶¶ 53–57. When a creator applies the NoAI tag to their work, Sketchfab embeds a machine-readable meta tag in the model's webpage conveying that restriction on AI-related uses. Id. Beaulier alleges that he manually applied the NoAI tag to each of his works uploaded onto Sketchfab, and that the tag is CMI under § 1202(c)(6) as a term governing use of the work. Id. ¶¶ 60, 123.

Beaulier's works are alleged to have reached Meta through Objaverse-XL, an academic dataset that indexes more than ten-million 3D assets drawn from public repositories, such as Sketchfab, Thingiverse, and Polycam. Id. ¶¶ 76–78. According to the complaint, Objaverse-XL does not itself store the models, but it preserves references back to the original source files, repositories, and creator accounts, so that an asset can be traced to the creator who published it. Id. ¶ 80. Meta is alleged to have used these references back to the original source files as a "source map" to locate and download the underlying models from the platforms hosting them.[1] Id. ¶ 87. After obtaining copies of the 3D models, Meta processed them through a machine-learning system that converts raw 3D files into training inputs through operations such as format conversion, mesh normalization, rendering, and voxelization, thereby producing numerical or visual representations of the works. Compl. ¶¶ 95–99. According to the complaint, that process preserves the expressive content of the works, including their "geometry, structure, textures, and visual features," while separating them from the attribution, licensing, and

[1] The complaint alleges that Meta has publicly disclosed pretraining on roughly 2.7 million meshes derived from Objaverse-XL. Compl. ¶ 109.

other CMI that previously accompanied them on their source platforms. Id. ¶¶ 99–101, 145. The complaint alleges that, once a 3D work was converted into training inputs, the system could "no longer" identify the creator or honor the governing licensing conditions. Id. ¶ 102. The complaint goes on to state that the separation of content from CMI is a "foreseeable and inherent consequence" of using large-scale datasets to train generative AI systems. Id. ¶ 103. The complaint further alleges that Meta did not maintain a system to track or preserve CMI on a per-work basis through this system, and that no process existed to filter out works whose licenses barred commercial use or use by AI models. Id. ¶¶ 45, 111.

The systems that trained on this data include SAM-3D, which the complaint describes as a tool that generates a three-dimensional reconstruction from a single two-dimensional photograph. Id. ¶¶ 12–13, 108–12. The complaint alleges that Meta uses the CMI-stripped inputs to train systems "capable of producing new 3D objects, environments, and digital assets," which Meta then integrates into commercial products, platforms, and technologies. Id. ¶¶ 105–06.

Beaulier asserts two claims, both under § 1202(b).

***First***, Plaintiff alleges the intentional removal of CMI in violation of § 1202(b)(1). The complaint describes Meta as having "removed, altered, or caused the removal or alteration of CMI" associated with 3D works, including creator attribution, licensing terms, and other identifying information. Compl. ¶ 146. Meta then "incorporated these CMI-stripped representations of Plaintiff's works into the training datasets used to develop its generative artificial intelligence systems." Id. ¶ 147.

***Second***, Plaintiff alleges a violation of § 1202(b)(3), which prohibits anyone from distributing, importing for distribution, or otherwise using CMI-stripped works, "knowing that copyright management information has been removed or altered without authority." Id. ¶ 157. The complaint alleges that Meta "used, distributed, and incorporated, the CMI-stripped representations "within the training datasets" used to develop its systems. Id. ¶ 162.

Both counts allege that Meta acted with knowledge, or with reason to know, that the removal would induce, enable, facilitate, or conceal infringement of Plaintiff's works. Id. ¶¶ 151, 164.

Meta moves to dismiss both counts under Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

A party may bring a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court accepts factual allegations as true and views them in the light most favorable to the plaintiff, "a formulaic recitation of the elements of a cause of action" and "naked assertion[s]" devoid of further factual backing are insufficient. Id.

## III. DISCUSSION

### A. Removal of Copyright Management Information

Count I alleges that Meta violated Section 1202(b)(1) of the Digital Millennium Copyright Act by intentionally removing CMI accompanying Plaintiff's 3D models when it prepared those works to train its generative systems. The provision states that "[n]o person shall, without the authority of the copyright owner or the law . . . intentionally remove or alter any copyright management information" while "knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b)(1). To state a claim, a plaintiff must plausibly allege four elements: (1) the existence of CMI associated with the work; (2) the removal or alteration of that CMI; (3) that the removal or alteration of CMI was intentional; and (4) that the defendant knew, or had reasonable grounds to know, that the removal would induce, enable, facilitate, or conceal infringement. See Stevens v. CoreLogic, Inc., 899



United States District Court
Northern District of California

F.3d 666, 673 (9th Cir. 2018); O'Neal v. Sideshow, Inc., 583 F. Supp. 3d 1282, 1286–87 (C.D. Cal. 2022).

The complaint adequately alleges the first, second, and fourth elements, but not the third.

**1. Existence of CMI**

The Court finds that Plaintiff's works were accompanied by CMI. The DMCA defines CMI to include a work's title and identifying information, the author's identity, the copyright owner's identity, and the "[t]erms and conditions for use of the work," when conveyed in connection with copies of the work. 17 U.S.C. § 1202(c)(1)–(3), (6). The complaint alleges that Plaintiff's models were published on certain platforms together with the creator's identity, the title of each work, and the governing Creative Commons license and attribution terms. Compl. ¶¶ 64–68. It further alleges that Plaintiff published more than 400 works under the CC-BY (attribution) license, id. ¶ 116, and that he applied a machine-readable "NoAI" designation to those works to prevent their use in AI training. Id. ¶¶ 53–56, 123. Such a restriction falls comfortably within Section 1202(c)(6)'s reference to "[t]erms and conditions for use of the work."

**2. Removal of CMI**

Meta's principal attack on the second element is that the complaint never actually alleges "removal." Meta urges the Court to take note of the fact that Plaintiff repeatedly describes Meta's conduct in the disjunctive, *i.e.*, that Meta "removed, failed to preserve, or disregarded" the CMI, and that the statute does not prohibit "failure to preserve" or "disregard[ing]" CMI, and that any references to "removal" of CMI are legal conclusions that the Court should not credit. Motion at 5–7. The Court disagrees.

The distinction between affirmative "removal" and "passive non-inclusion" has been rejected at the pleading stage in similar cases. See Doe 1 v. GitHub, Inc., 672 F. Supp. 3d 837, 857–58 (N.D. Cal. 2023). A plaintiff is not ordinarily required to plead the precise mechanisms by which a defendant stripped CMI, because the means by which a defendant handles inputs within its proprietary systems is a matter particularly within the

United States District Court
Northern District of California

defendant's knowledge. See Izmo, Inc. v. Roadster, Inc., 2019 WL 13210561, at *3 (N.D. Cal. Mar. 26, 2019) (citing Friedman v. Live Nation Merch., Inc., 833 F.3d 1180, 1189 (9th Cir. 2016)). The complaint adequately alleges that CMI accompanied Plaintiff's works but was absent from the training representations that Meta produced. That suffices to allege the fact of removal at this stage. Whether that removal was intentional is a distinct question to which the Court now turns.

#### 3. Intentional Removal

Section 1202(b)(1) reaches only "intentional[]" removals of CMI. The question for the Court is whether Plaintiff has sufficiently pleaded facts supporting the reasonable inference that Meta's removal of CMI was intentional rather than an incidental byproduct of a process undertaken for a different purpose.

On that question, this Court finds its prior decision in Logan v. Meta Platforms, Inc., 2023 WL 3668520 (N.D. Cal. May 24, 2023), applicable. There, the Court held that an "unintended side effect" of a uniform process — namely, the cropping of photos into a thumbnail — rather than a targeted act directed at severing CMI from a work, was not a targeted act sufficient to satisfy the intent requirement for § 1202(b)(1). Id. at *6. The Court contrasted cases in which a defendant removed a watermark indicating the work's owner while leaving the rest of the work intact, which constitutes conduct from which intent could be inferred. Id. at *7. The distinction that Logan drew between a uniform transformation that incidentally sheds CMI and a discrete act that singles out CMI is the distinction on which this claim ultimately turns.

Applying the Logan framework, the complaint's allegations describe an instance of uniform transformation that incidentally sheds CMI. Plaintiff alleges that Meta processed his 3D models through a system that converts raw 3D files into training inputs by means of "format conversion, mesh normalization, rendering, voxelization, and related transformations." Compl. ¶ 145. The purpose of this process, as pleaded, is to render the works usable for training rather than to strip them of CMI. And Plaintiff characterizes the resulting loss of CMI in terms that place it squarely within the "unintended side effect"

side of the spectrum identified in Logan. Plaintiff alleges that, in converting his works into training inputs, "it is no longer possible for the training system itself to identify the creator of the work," Compl. ¶ 102, and that the "separation between the creative content of a work and the CMI that accompanied it is a foreseeable and inherent consequence of using large-scale creative datasets to train generative artificial intelligence systems." Id. ¶ 103. That allegation belies a claim of intentional removal. An "inherent consequence" of a process is not necessarily one produced by an affirmative decision to eliminate CMI from a particular work. The conversion that Plaintiff describes would appear to operate the same way whether CMI is present or not: it carries forward the "geometry and textures of a 3D model" into a format suitable for training, and does not carry forward the attribution and licensing metadata that the format, as pleaded, simply cannot accommodate. See id. ¶¶ 102–03. Just as the thumbnail crop in Logan, the conversion Plaintiff describes discards everything that is not part of the training signal — including, but not specifically targeting, CMI.

Plaintiff characterizes the conversion as one that "retained the works' expressive content while severing the accompanying CMI." Opp. at 8. But as currently written, the complaint alleges that the training system preserves geometry and texture while omitting metadata as a whole. See Compl. ¶¶ 99–101. Without more, these allegations do not plausibly state a claim that CMI was singled out for removal. As it stands, retaining useful portions of information and discarding the rest is not sufficient to demonstrate intent. And an allegation that separation of CMI is "inherent" in the conversion does not rise to the level of showing that Meta configured the system to scope out and delete CMI that the system could otherwise have preserved.

Plaintiff's related contention that the deletion or loss of CMI was "an avoidable design choice" appears nowhere in the complaint and contradicts the assertion that the loss of CMI was an "inherent" design choice. See Opp. at 8. Plaintiff cannot amend his complaint through the opposition brief — Plaintiff pleaded that separation of CMI was inherent to the system, and the Court credits that allegation at this stage.



United States District Court
Northern District of California

Finally, the Court notes that Plaintiff's complaint is materially distinguishable from New York Times Co. v. Microsoft Corp., where the plaintiff alleged that the defendants used specific content-extraction algorithms that were designed to separate an article's main content from its "footers" and "copyright notices," and that the defendants "chose not to extract author and title information" when a viable, information-preserving alternative was available. 777 F. Supp. 3d 283, 314–16 (S.D.N.Y. 2025); see also Concord Music Grp. v. Anthropic PBC, 2025 WL 4808984, at *4 (N.D. Cal. Oct. 6, 2025) (sustaining claim because plaintiffs alleged that defendant chose one extraction tool over another "specifically because it was more effective at removing CMI"). Without alleging a deliberate, CMI-centered choice, rather than a mere byproduct in which CMI is lost, the complaint fails to allege that Meta intentionally removed CMI.

**4. Knowledge or Reasonable Grounds to Know**

Finally, despite the inadequate showing of intentional removal, Plaintiff adequately alleges that Meta knew, or had reasonable grounds to know, that the removal of CMI would enable, facilitate, or conceal infringement. Section 1202(b) requires that the defendant have acted "knowing, or . . . having reasonable grounds to know, that [the removal] will induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b). Meta contends that Plaintiff offers only a conclusory assertion that Meta knew that removal would "induce, enable, facilitate, or conceal infringement." Motion at 9–10. This is not the full story. Plaintiff alleges that Meta stripped not only generic identifiers, such as a creator's name or a work's title, but also the license, including attribution, non-commercial, and "NoAI" terms that defined the permitted scope of each work's use. Compl. ¶¶ 40–41, 46–48, 53–60, 116, 123. Such terms are protected CMI, as § 1202(c)(6) reaches the "[t]erms and conditions for use of the work." 17 U.S.C. § 1202(c)(6). Thus, the removed CMI is the very information that marked the boundaries of authorized use, and Plaintiff alleges that its removal thereby enabled Meta to use the works outside those boundaries. Using a copyrighted work beyond the scope of its license falls under the scope of infringement. Oracle USA, Inc. v. Rimini St., Inc., 879 F.3d 948, 954 (9th Cir. 2018).

The complaint further alleges that Meta knew the works were distributed with per-work license, attribution, and NoAI terms, Compl. ¶ 148; that Meta did not maintain a system to track or honor those terms on a per-work basis or a process to filter out works whose licenses barred commercial or AI use, id. ¶¶ 44–45, 111; and that, when stripped of that information, Meta could neither identify nor comply with the conditions governing those works, allowing its systems to use them at scale without regard for those conditions. Id. ¶¶ 48–50, 150. Taken as true, those allegations support a reasonable inference that Meta had reasonable grounds to know that removal would enable or facilitate infringement. See Doe 1, 672 F. Supp. 3d at 858–59.

Meta raises additional arguments that are serious challenges to the merits, but they do not reveal a pleading defect. For instance, Meta contends that it would have used the works regardless of whether the license terms traveled with them, so that removal did not actually enable any infringement that would not have occurred anyway. Reply at 5–6. At the pleading stage, Plaintiff's allegation that the absence of per-work CMI made it practicable for Meta to use millions of works without honoring applicable restrictions is a plausible inference, and Meta's competing account may be properly tested on a more developed record. Compl. ¶¶ 44–45, 111.

Accordingly, the fourth element is adequately alleged.

*   *   *

In summary, Count I is **DISMISSED WITH LEAVE TO AMEND** because Plaintiff failed to plausibly allege the third element of intent.

### B. Distribution of Works

Plaintiff next alleges that Meta violated 17 U.S.C. § 1202(b)(3), which prohibits distributing, importing for distribution, or publicly performing works, copies of works, or phonorecords, knowing that CMI has been removed or altered, while "having reasonable grounds to know, that it will induce, enable, facilitate, or conceal" infringement. 17 U.S.C. § 1202(b)(3). To succeed on a claim, a plaintiff must allege (1) the existence of CMI in connection with the work; (2) that the defendant distributed the work or copies of the



United States District Court
Northern District of California

work; (3) while knowing that CMI had been removed or altered without authority; and (4) while knowing, or having reasonable grounds to know, that the distribution would induce, enable, facilitate, or conceal infringement. Id.; see Mango v. BuzzFeed, Inc., 970 F.3d 167, 171 (2d Cir. 2020).

This claim fails at the second element, and the Court rests its dismissal on that ground alone. Specifically, the complaint does not allege distribution. Courts construe the term "distribute" in § 1202(b)(3) in light of the distribution right in § 106(3) of the Copyright Act, which reaches the transfer of a work "to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3); see New York Times, 777 F. Supp. 3d at 318 ("[C]ourts have understood the term 'distribute' in section 1202(b)(3) to require a 'sale or transfer of ownership extending beyond that of a mere public display[.]'"); Wright v. Miah, 2023 WL 6219435, at *7 (E.D.N.Y. Sept. 7, 2023) ("Section 1202(b) does not define 'distribution,' but courts have interpreted the term as pertaining to a sale or transfer of ownership extending beyond that of a mere public display."). The complaint does not allege such a transfer — it instead alleges that Meta "used, distributed, and incorporated" the CMI-stripped representations of Plaintiff's works "within the training datasets used to develop its generative artificial intelligence systems." Compl. ¶ 162. This allegation concerns internal use, not distribution. The movement of copies within a single enterprise, as alleged by Plaintiff, does not satisfy the transfer that § 1202(b)(3) requires.

Accordingly, the complaint does not state a claim for distribution of works with CMI removed, and Count II is therefore **DISMISSED WITH LEAVE TO AMEND**.

### C. Leave to Amend

Leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). Dismissal without leave is appropriate, though, where no amendment could cure the deficiency. Generally, leave to amend is granted with "extreme liberality." Eminence Cap., LLC v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003).

The defect that led to dismissal of Count I is narrow: the complaint adequately

alleges the existence of CMI, the fact of its separation from Plaintiff's works, and Meta's knowledge that removal would enable or facilitate infringement. The single element on which Count I fails is intentional removal — *i.e.*, whether Meta targeted the CMI or merely lost it as an incidental byproduct of conversion. That is a defect that further factual allegations may address.

The Court also grants leave to amend Count II, though the Court reiterates that Count II fails not because certain scienter elements have not been met, but rather because the complaint fails to allege distribution. As discussed above, an amended distribution claim must allege an actual transfer beyond internal use.

## IV. CONCLUSION

For the foregoing reasons, Meta's motion to dismiss is **GRANTED** as to both Counts I and II. Meta's request that dismissal be entered with prejudice is **DENIED**, and Plaintiff is granted **LEAVE TO AMEND**. Any amended complaint shall be filed within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: August 26, 2026

CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

# EXHIBIT B

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
August 21, 2026
Lyle W. Cayce
Clerk

No. 23-50750

Kipp Flores Architects, L.L.C.,

*Plaintiff—Appellant*,

*versus*

AMH Creekside Development, L.L.C.; American Homes 4 Rent; American Housing Ventures, L.L.C.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-1158

Before Haynes, Willett, and Oldham, *Circuit Judges*.

Don R. Willett, *Circuit Judge*:*

This case presents multiple questions of first impression under the Architectural Works Copyright Protection Act (AWCPA) and the Digital Millenium Copyright Act (DMCA)—two 1990s amendments to the Copyright Act of 1976. But a thorny jurisdictional issue comes first: whether the district court's order dismissing only part of this case under Federal Rule

* Judge Haynes concurs only in the judgment.

of Civil Procedure 41(a)(2)—despite that rule's text referring only to dismissal of "an action"—undermines our appellate jurisdiction.

Although the district court erred by dismissing only part of an action under Rule 41(a)(2), that error does not deprive us of appellate jurisdiction. Assured of our jurisdiction, we AFFIRM the district court's dismissal of plaintiff Kipp Flores Architects, L.L.C.'s DMCA claims but VACATE the dismissal of the copyright infringement claims and REMAND for further proceedings.

## I. Background

### A. Factual Background

Kipp Flores Architects, LLC (KFA) is an architecture firm that designs buildings and produces technical drawings depicting those buildings. As relevant here, KFA has registered copyrights in three building plans, as well as technical drawings for one of the three.

In January 2016, KFA entered into a licensing agreement with American Housing Ventures, LLC ("AHV") that allowed AHV to use specific KFA architectural works and technical drawings for construction and marketing within a 50-mile radius of Austin, Texas. The agreement required AHV to include KFA's copyright management information (CMI)—including KFA's name, the copyright symbol, and the date of first publication—on any displays of KFA's works. It also provided that "[a]ny publication of [KFA]'s works without this Copyright Management Information, or any removal or alteration of the Copyright Management information on existing copies, will be unauthorized and a violation of the Digital Millenium Copyright Act."

When KFA sent copies of its works to AHV for use in two Austin-area developments, the works included the following copyright notice:

> All rights reserved. © 2002 Kipp, Flores Architects LLC. The arrangements depicted herein are the sole property of Kipp, Flores Architects, and may not be reproduced in any form without its written permission. This copyright notice and use restrictions are "Copyright Management Information" under the Digital Millenium Copyright Act. It is included to detect and deter copyright infringement, and as such must not be modified or omitted.

As part of the marketing for the two developments, AHV enlisted AGS Graphics and BluEnt to create floorplan drawings and elevation renderings of the KFA works, respectively. KFA then began working directly with AGS Graphics and BluEnt, executing limited use agreements with each company and providing them with copies of the works. Like KFA's agreement with AHV, its agreements with AGS Graphics and BluEnt required KFA's copyright notice to appear on all copies of KFA's works, including copies used in marketing and advertising. The complaint does not allege that AHV saw KFA's agreements with AGS Graphics and BluEnt.

AGS Graphics and BluEnt then produced floorplan drawings and renderings for AHV based on KFA's works. However, those drawings and renderings did not include KFA's copyright notice or otherwise mention KFA. AHV then constructed buildings embodying KFA's copyrighted architectural works in the two Austin-area developments. By 2018, each of KFA's works had been built at least once.

In late 2017, AHV informed KFA that it intended to use the licensed works for a third development—Creekside Ranch in New Braunfels, Texas—which was owned by AMH Creekside and for which AHV served as the development manager. In April 2019, KFA, AHV, and AMH Creekside agreed to partially assign AHV's right to use KFA's copyrighted works to AMH Creekside. Under this agreement, AMH Creekside agreed

to "accept[] and assume[] all of the terms, benefits, and obligations" that belonged to AHV under the original licensing agreement between KFA and AHV "with respect to" Creekside Ranch.

AHV then sent the floorplans and renderings that AGS Graphics, and BluEnt had produced to AMH Creekside and American Homes for Rent (AMH Creekside's parent company). AMH Creekside and American Homes for Rent (collectively, "the Creekside defendants") then used the floorplans and renderings in internet marketing.

When KFA discovered these marketing materials, it sent AHV and the Creekside defendants a notice of default alleging that they had violated the terms of the original licensing agreement and the assignment by publishing copies of floorplans and renderings based on KFA's copyrighted works without including KFA's copyright information. About two months later, KFA sent the Creekside defendants a notice of termination, terminating the licensing agreement and demanding that AMH Creekside cease using KFA's works and return all copies of KFA's plans, drawings, and other materials that incorporated KFA's designs.

## B. Procedural History

When AMH Creekside did not return KFA's materials, KFA filed this suit, naming AHV and the Creekside defendants. The amended complaint included four counts: violation of the DMCA, copyright infringement, conversion, and specific performance. AHV and the Creekside defendants filed separate motions to dismiss, which the district court granted in part. The district court dismissed KFA's DMCA and conversion claims against all defendants. It also dismissed KFA's infringement claim against AMH Creekside entirely, against AHV to the extent it was premised on contributory infringement, and against American Homes for Rent to the extent it was premised on direct infringement.

However, the court did not dismiss KFA's specific-performance claim against AMH Creekside or its infringement claim to the extent it relied on a direct infringement theory against AHV and a contributory infringement theory against the Creekside defendants.

Concluding that its remaining claims were not worth pursuing, KFA filed a motion to voluntarily dismiss its remaining claims with prejudice. KFA asked the district court to enter final judgment so that it could appeal the partial dismissal. The defendants did not oppose the request, and the district court granted it and entered judgment dismissing KFA's claims with prejudice. KFA then appealed.

## II. Jurisdiction

Before reaching the merits, we must assure ourselves of jurisdiction. Although the parties agree we have it, we must examine the question *sua sponte* and discuss it "when it appears at all questionable."[1]

Here, the procedural posture presents a potential obstacle. Voluntary motions to dismiss like the one KFA filed in the district court are governed by Rule 41(a).[2] That rule, however, permits dismissal of "an action," which under our precedent means "an entire action—not particular claims."[3] Thus, Rule 41(a) did not authorize the district court to dismiss only KFA's remaining claims. And we have held that a purported dismissal under Rule 41(a)(1) that dismisses only particular claims is a "nullity"[4] that leaves those

---

[1] *Odeco Oil & Gas Co., Drilling Div. v. Bonnette*, 4 F.3d 401, 403 n.2 (5th Cir. 1993).

[2] *See* Fed. R. Civ. P. 41(a).

[3] *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 720 (5th Cir. 2010).

[4] *Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 345 (5th Cir. 2020) (en banc).

claims "still pending in [the] district court"—depriving the resulting judgment of finality (and us of jurisdiction).[5]

Nevertheless, jurisdiction here is proper. Although an invalid Rule 41(a)(1) dismissal is a nullity that cannot confer jurisdiction, the logic underlying that principle does not apply to invalid Rule 41(a)(2) dismissals. Because Rule 41(a)(1) dismissals occur by operation of the rule, they happen only if the rule's requirements are satisfied. Rule 41(a)(2) dismissals, by contrast, occur by order of the court. And like any other erroneous dismissal, they *occur* even if they are *erroneous*. Thus, while an erroneous Rule 41(a)(2) dismissal may provide a basis for reversing a judgment, it does not provide a basis for dismissing an appeal.

### A. Rule 41(a)

I begin by reiterating a well-established principle. Voluntary dismissal is governed by Rule 41(a). Both of Rule 41(a)'s subparts speak solely of dismissing "an action."[6] And we have long held that "when Rule 41(a) refers to [d]ismissal of an 'action,' there is no reason to suppose that the term is intended to include the separate claims which make up an action."[7] Thus, although we have allowed plaintiffs to use Rule 41(a) to dismiss all claims against a particular defendant "despite the fact that the case would remain

---

[5] *Exxon Corp. v. Md. Cas. Co.*, 599 F.2d 659, 663 (5th Cir. 1979).

[6] *See* FED. R. CIV. P. 41(a)(1)(A) ("[T]he plaintiff may dismiss *an action* without [a] court order . . . ." (emphasis added)); FED. R. CIV. P. 41(a)(2) ("Except as provided in Rule 41(a)(1), *an action* may be dismissed at the plaintiff's request only by court order . . . ." (emphasis added)).

[7] *Exxon Corp.*, 599 F.2d at 662 (emphasis and citation omitted).

pending against another defendant,"[8] we have consistently rejected attempts to use Rule 41(a) to dismiss only "some claims against a single defendant."[9]

The district court violated that principle by granting KFA's motion to dismiss under Rule 41(a)(2) even though it sought dismissal of only some claims against each defendant.[10] When a plaintiff wants to take some (but not all) of their claims out of play, they must resort to another mechanism—such as an amended complaint under Rule 15.

### B. Jurisdictional Implications

Answering the Rule 41(a) question does not, by itself, answer the jurisdictional one. Ordinarily, a judgment is not an unappealable nullity merely because it rests on a misapplication of the Federal Rules of Civil Procedure.[11] So, for example, if a district court dismisses a case under Rule 12(b)(6) based on lack of evidence for plaintiffs' claims—despite Rule 12(b)(6)'s exclusive focus on the allegations in the complaint[12]—we do not throw up our hands and declare the mistake beyond our power to correct. We

---

[8] *Id.* (discussing *Plains Growers, Inc. ex rel. Florists' Mut. Ins. Co. v. Ickes-Braun Glasshouses, Inc.*, 474 F.2d 250 (5th Cir. 1973)); *see also Williams*, 958 F.3d at 345 ("[O]ur circuit precedents interpret 'action' to cover individual defendants—thus allowing plaintiffs . . . to use Rule 41(a) to dismiss individual defendants." (citations omitted)).

[9] *CBX Res., L.L.C. v. ACE Am. Ins. Co.*, 959 F.3d 175, 177 n.1 (5th Cir. 2020); *see also Bailey*, 609 F.3d at 729; *Exxon Corp.*, 599 F.2d at 662.

[10] On this point, at least, there is no daylight between my position and that of the dissent. *See infra*, at 41 (Oldham, J., dissenting) ("Thus, the district court could not have dismissed Kipp Flores's remaining claims under Rule 41.").

[11] *Cf. N.Y. Life Ins. Co. v. Brown*, 84 F.3d 137, 143 (5th Cir. 1996) ("A judgment is not void merely because it is erroneous." (citation omitted)).

[12] *See Ferrer v. Chevron Corp.*, 484 F.3d 776, 782 (5th Cir. 2007) ("[A] 12(b)(6) inquiry focuses on the allegations in the pleadings, not whether a plaintiff actually has sufficient evidence to succeed on the merits.").

assert jurisdiction and correct the error.[13] So too if a district court flouts Rule 56(a) by weighing the evidence itself rather than leaving that task to the factfinder: we do not sit idly by—we reverse.[14] Generally, when the district court dismisses a claim based on a misapplication of the Federal Rules, that dismissal is a reversible error, not an unappealable nullity.

That rule stems from a bedrock principle of jurisdiction: the Constitution gives Congress—and only Congress—the power to "expand or retract the limits of federal judicial power."[15] Thus, "only statutory provisions . . . , not 'court-made' procedural rules" "can be jurisdictional."[16] And letting a district court's misapplication of the Rules strip us of jurisdiction to correct it would defeat the very purpose of appellate review—"correcting errors that occurred at the trial court level"[17]—by insulating errors from review simply because they are erroneous. Thus, the general rule is that the district court's misapplication of the Rules does not affect our jurisdiction.[18]

---

[13] *See, e.g.*, *Molzan v. Bellagreen Holdings, L.L.C.*, 112 F.4th 323, 333 (5th Cir. 2024).

[14] *See, e.g.*, *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 128 (5th Cir. 1994).

[15] *Murphy v. Uncle Ben's, Inc.*, 168 F.3d 734, 741 (5th Cir. 1999); *see also Anthology, Inc. v. Tarrant Cnty. Coll. Dist.*, 136 F.4th 549, 553 (5th Cir. 2025) ("Only Congress and the Constitution define—and thus can limit—the jurisdiction of federal courts.").

[16] *Stelly v. Duriso*, 982 F.3d 403, 407 n.5 (5th Cir. 2020) (quoting *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 19 (2017)). True, rulemaking under § 101 of the Federal Courts Administration Act of 1992 (FCAA), 28 U.S.C. § 1292(e), can define finality for purposes of appellate jurisdiction. But the last substantive change to Rule 41(a) occurred long before the FCAA was adopted, so the FCAA does not provide a basis for concluding that the promulgation of Rule 41(a) limited our jurisdiction.

[17] *Goodwin v. Johnson*, 132 F.3d 162, 174 (5th Cir. 1997).

[18] The dissent disagrees, pointing to four supposed counterexamples: (1) erroneous denials of motions to dismiss, (2) motions for summary judgment, (3) motions for partial final judgment, and (4) motions to certify an interlocutory appeal. *See infra*, at 44 (OLDHAM, J., dissenting). As the dissent rightly notes, none of those erroneous denials

In *Exxon Corp. v. Maryland Casualty Co.*, however, we held that invalid Rule 41(a)(1) dismissals fall outside the general rule.[19] In *Exxon Corp.*, the district court dismissed one of the plaintiff's two claims and denied the request for a partial final judgment under Rule 54(b).[20] The plaintiff then filed a notice of dismissal purporting to unilaterally dismiss the second claim under the portion of Rule 41(a)(1) allowing a plaintiff to voluntarily dismiss his case before the opposing party files an answer or a motion for summary judgment.[21] On appeal, this court held that the notice of dismissal was invalid because it dismissed only one claim, not the entire action.[22] As a result, the court dismissed the appeal for lack of jurisdiction, reasoning that the plaintiff "had no power unilaterally to withdraw the second claim from its complaint," so "the second claim [was] still pending in district court."[23]

Unlike *Exxon Corp.*, this case involves a purported dismissal under Rule 41(a)(2), not Rule 41(a)(1). That difference matters. Whereas a Rule

---

triggers appellate jurisdiction. But that only proves the principle the dissent rejects: in each of the dissent's examples, our jurisdiction turns on what the district court *did*, not on whether it did it erroneously. So, for example, we generally lack jurisdiction over denials of motions to dismiss—whether the denial was correct or erroneous. The dissent is right that "errors [do] not *give* appellate jurisdiction." *Infra*, at 44 (Oldham, J., dissenting) (emphasis added). But it is wrong to suggest that the district-court error here is enough to *deprive* us of appellate jurisdiction over an otherwise appealable final judgment.

[19] *See* 599 F.2d at 663.

[20] *Id.* at 660–61.

[21] *Id.* at 661. When *Exxon* was decided, this portion of Rule 41(a)(1) was labeled Rule 41(a)(1)(i). *See id.*; Fed. R. Civ. P. 41(a)(1)(i) (1976). It has since been restyled—without substantive changes—as Rule 41(a)(1)(A)(i). *See* Fed. R. Civ. P. 41(a)(1)(A)(i).

[22] *Exxon Corp.*, 599 F.2d at 662.

[23] *Id.* at 663.

41(a)(1) dismissal is "immediately self-effectuating,"[24] Rule 41(a)(2) requires a court order.[25] Thus, under Rule 41(a)(1) the plaintiff's filing "is the legally operative act of dismissal,"[26] while under Rule 41(a)(2) the court order is.

Although *Exxon Corp.*'s reasoning on the jurisdictional question is scant, it appears to rest on precisely this distinction. The reason we concluded that the plaintiff's remaining claim was "still pending in [the] district court" was because the plaintiff "had no power unilaterally to withdraw" it.[27] In other words, because Rule 41(a)(1) dismissals occur only by operation of rule, they occur only when the rule's preconditions are triggered. By contrast, a Rule 41(a)(2) dismissal occurs if—but only if—the court so orders. Thus, the "alpha and omega" of a Rule 41(a)(1) dismissal is "the doing of the plaintiff alone"[28] (and if the plaintiff does not take the right steps, the dismissal never occurs), whereas the alpha and omega of a Rule 41(a)(2) dismissal is the court order. And like every other species of court order, Rule 41(a)(2) dismissal orders do not cease to exist merely because they are erroneous.

---

[24] *Qureshi v. United States*, 600 F.3d 523, 525 (5th Cir. 2010); *see also Waetzig v. Halliburton Energy Servs.*, Inc., 604 U.S. 305, 308 (2025) (explaining that a Rule 41(a) dismissal is "effective without any court action").

[25] Fed. R. Civ. P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order . . . .").

[26] *Derr v. Swarek*, 766 F.3d 430, 440 (5th Cir. 2014) (cleaned up).

[27] *Exxon Corp.*, 599 F.2d at 663.

[28] *Qureshi*, 600 F.3d at 525.

It is true that we have twice phrased *Exxon Corp.*'s rule as though it applied to *all* Rule 41(a) dismissals.[29] In *Williams v. Taylor Seidenbach, Inc.*, we cited *Exxon Corp.* for the proposition that "an invalid Rule 41(a) dismissal is a nullity."[30] And in *National Horsemen's Benevolent and Protective Ass'n v. Black*, we observed that a purported Rule 41(a) dismissal "was invalid" because "[o]ur precedent" (namely, *Exxon Corp.*) "does not allow" using Rule 41(a) to dismiss only particular claims.[31]

On closer inspection, both statements are dicta twice over. First, they are dicta because they addressed situations not before the court in either case.[32] In *Williams*, our paraphrase of *Exxon* occurred in a portion of the opinion expressly set off as dicta; we expressly noted that "we ha[d] no occasion" to reach the issue discussed.[33] And in *National Horsemen's*, our comment was a straightforward application of *Exxon Corp.* in its natural habitat—a Rule 41(a)(1) dismissal.[34] Second, they are dicta because neither remark was necessary to the result.[35] In both *Williams* and *National*

---

[29] *See Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 878 (5th Cir. 2022); *Williams v. Taylor Seidenbach, Inc.*, 958 F.3d 341, 345 (5th Cir. 2020) (en banc).

[30] *Williams*, 958 F.3d at 345.

[31] *Nat'l Horsemen's*, 53 F.4th at 878.

[32] *See Connecticut v. Doehr*, 501 U.S. 1, 30 (1991) (Rehnquist, C.J., concurring) (describing dicta as language in an opinion "discuss[ing] abstract and hypothetical situations not before" a court).

[33] *Williams*, 958 F.3d at 345.

[34] *See Nat'l Horsemen's*, 53 F.4th at 875 (noting that the plaintiff filed a "notice dismissing [its] claim").

[35] *See Perez v. Stephens*, 784 F.3d 276, 281 (5th Cir. 2015) (defining obiter dictum as "a judicial comment that is unnecessary to the decision in the case and therefore not precedential" (cleaned up)).

*Horsemen*'s, we found appellate jurisdiction proper.[36] Any observation about potential jurisdictional problems that did not rear their heads cannot have been necessary to finding jurisdiction, and such observations are therefore "not precedential."[37] And not only are the statements in *Williams* and *National Horsemen*'s dicta, they are unreasoned dicta: *Williams* simply cited *Exxon Corp.*, and *National Horsemen*'s simply cited *Exxon Corp.* and *Williams*.[38]

But even if the isolated statements in these cases could be considered part of the holding, it still would not support extending *Exxon Corp.* to Rule 41(a)(2) dismissals. "It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision."[39] Placing decisive weight on the use of the term "Rule 41(a)" instead of "Rule 41(a)(1)" in cases that discussed Rule 41(a)(1) would be to "parse[]" "the language of an opinion . . . as though we were dealing with the language of a statute."[40] That is not a proper way of reading precedents.

Rather, it is "a judicial decision's reasoning—its *ratio decidendi*—that allows it to have life and effect in the disposition of future cases."[41] As

---

[36] *See Williams*, 958 F.3d at 349; *Nat'l Horsemen's*, 53 F.4th at 879.

[37] *Perez*, 784 F.3d at 281 (citation omitted).

[38] *See Williams*, 958 F.3d at 345; *Nat'l Horsemen's*, 53 F.4th at 878 & n.15.

[39] *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821); *accord Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026).

[40] *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (cleaned up).

[41] *Ramos v. Louisiana*, 590 U.S. 83, 104 (2020) (opinion of GORSUCH, J.).

explained above, *Exxon Corp.*'s reasoning does not extend to Rule 41(a)(2). An errant dismissal order is miles away from no dismissal order at all. Erroneous though it may have been, the district court's judgment evinced its "inten[t] to have nothing further to do[] with . . . the case."[42] For purposes of our jurisdiction, that is all that matters.

## III. Standard of Review

Assured that we have jurisdiction, I turn to the merits. We review a Rule 12(b)(6) dismissal de novo.[43] To survive a Rule 12(b)(6) motion to dismiss, a complaint must satisfy Rule 8(a)(2)'s pleading standard—that is, it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[44] That requires the complaint to "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[45] Although affirmative defenses must ordinarily be pleaded in an answer,[46] "[d]ismissal under Rule 12(b)(6) may be appropriate based on a successful affirmative defense, provided that the affirmative defense appears on the face of the complaint."[47]

## IV. Discussion

Because KFA has abandoned its specific-performance claim, its direct-infringement claim against AHV, and its contributory-infringement claim against the Creekside defendants, I consider only the remaining claims.

---

[42] *Ueckert v. Guerra*, 38 F.4th 446, 450 (5th Cir. 2022) (cleaned up).

[43] *See, e.g.*, *Favre v. Sharpe*, 117 F.4th 342, 346 (5th Cir. 2024).

[44] Fed. R. Civ. P. 8(a)(2); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[45] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

[46] *See* Fed. R. Civ. P. 8(c)(1).

[47] *In re 3 Star Props., L.L.C.*, 6 F.4th 595, 604 (5th Cir. 2021) (citation omitted).

## A. Copyright Infringement

The district court dismissed KFA's copyright infringement claims, relying on § 120(a) of the AWCPA.[48] Because this is our court's first brush with the AWCPA,[49] I begin with a brief account of its history.[50]

"Historically, copyright law provided limited protection to works of architecture."[51] Although "architectural plans, blueprints, and technical drawings, as well as original, creative sketches" could be protected as "pictorial, graphic, and sculptural" (PGS) works, the "architectural structures themselves" received no copyright protection.[52] As a result, copyrights in the architectural plans did not "clothe their author with the exclusive right to reproduce the dwelling pictured."[53]

Change came when the United States joined the Berne Convention for the Protection of Literary and Artistic Works, which "requires protection for 'works of . . . architecture' as distinct from 'illustrations, maps, plans, sketches and three-dimensional works relative to . . . architecture.'"[54] In

---

[48] *See* 17 U.S.C. § 120(a).

[49] In a previous case involving KFA, an insurer argued that § 120(a) protected another homebuilder's use of KFA's designs. *See Mid-Contintent Cas. Co. v. Kipp Flores Architects, L.L.C.*, 602 F. App'x 985, 998 (5th Cir. 2015). However, we did not address the merits of the argument. *See id.*

[50] *See United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (explaining that "[s]tatutory history, the record of enacted changes Congress made to the relevant statutory text over time," is part of the "context" from which "text should never be divorced" (cleaned up)).

[51] *T-Peg, Inc. v. Vt. Timber Works, Inc.*, 459 F.3d 97, 109 (1st Cir. 2008).

[52] *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 188 (2d Cir. 2012); *see also T-Peg, Inc.*, 459 F.3d at 109 ("[A]rchitectural structures themselves were afforded virtually no protection.").

[53] *Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 899 (5th Cir. 1972).

[54] *T-Peg, Inc.*, 459 F.3d at 109 (citation omitted).

1988, Congress passed the Berne Convention Implementation Act (BCIA), which redefined PGS works to expressly "includ[e] architectural plans."[55] However, the BCIA "did not explicitly extend protection to 'architectural works,' as distinct from architectural plans."[56]

That change came two years later, with the passage of the AWCPA. Rather than tinker with definitions, the AWCPA added "architectural works" as their own category of copyrightable works.[57] It defined an "architectural work" as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings," including "the overall form as well as the arrangement and composition of spaces and elements in the design."[58]

After the AWCPA, therefore, architecture enjoys "two forms of protection."[59] First, under the BCIA, "architectural plans" can qualify as PGS works and thus qualify for protection under § 102(a)(5)—provided they meet the other elements of a PGS work.[60] Second, "architectural works" receive independent protection under § 102(a)(8).[61] Because KFA alleges copyrights of both types, I consider each in turn.

But while the AWCPA gave "architectural works" a broad definition,[62] it also imposed a limitation on the protection for such works:

---

[55] Pub. L. 100–568, 102 Stat. 2853, 2854, § 4(a)(1)(A) (codified at 17 U.S.C. § 101).

[56] *T-Peg, Inc.*, 459 F.3d at 109.

[57] Pub. L. 101–650, 104 Stat. 5089, 5133, § 703 (codified at 17 U.S.C. § 102(a)(8)).

[58] 17 U.S.C. § 101.

[59] *T-Peg, Inc.*, 459 F.3d at 109.

[60] 17 U.S.C. § 101; *see id.* § 102(a)(5).

[61] *Id.* § 102(a)(8).

[62] *See T-Peg, Inc.*, 459 F.3d at 110.

§ 120(a), which is at the heart of this appeal.[63] Because this case requires me to parse § 120(a)'s text, I reproduce it in full:

> The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.[64]

1. PGS Works

First, KFA argues that the district court erred by applying § 120(a) to PGS works. I agree. Although § 120(a) limits a copyright holder's exclusive rights under § 102(a)(8), it leaves § 102(a)(5) rights untouched.

Begin with the text—"the alpha and the omega of the interpretive process."[65] By its terms, § 120(a) limits only "[t]he copyright in an *architectural work* that has been constructed."[66] It says nothing about PGS works—a silence both deafening and dispositive. Because we cannot second-guess Congress's choice not to legislate any more than we can second-guess its choice to legislate, we must think twice—maybe thrice—before construing a statute that speaks of only one thing to cover others as well.[67]

---

[63] *See Leicester v. Warner Bros.*, 232 F.3d 1212, 1217 (9th Cir. 2000) ("Congress did not afford architectural works full copyright protection; rather, it exempted the making of pictorial representations of architectural works from copyright infringement.").

[64] 17 U.S.C. § 120(a).

[65] *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018).

[66] 17 U.S.C. § 120(a) (emphasis added).

[67] *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 93 (2012) ("[A] matter not covered is to be treated as not covered.").

Section 120's heading—"Scope of exclusive rights in architectural works"—further supports this conclusion.[68] To be sure, statutory headings "cannot substitute for the operative text."[69] But they are undoubtedly part of the "context" from which that "text should never be divorced."[70] Accordingly, they are a useful "tool[] . . . for the resolution of a doubt about the meaning of a statute."[71] If § 120(a)'s text left any doubt that it limits only the scope of a copyright holder's exclusive right in an architectural work—but not a PGS work—the heading resolves it.

Because § 120(a) applies only to architectural works, the district court erred in using it to dismiss KFA's claims based on its PGS works.

2. Architectural Works

That leaves KFA's architectural works, which are undoubtedly limited by § 120(a). The remaining question, therefore, is whether the floorplans and digital renderings generated by AGS Graphics and BluEnt fall within § 120(a)'s safe harbor. They do.

a. Pictorial Representations

KFA argues first that the floorplans and digital renderings fall outside § 120(a) because they are not "pictorial representations." I disagree.

First, the ordinary meaning of "pictorial representations" clearly covers the floorplans and digital renderings. In the relevant sense, the noun

---

[68] *See id.* at 221 ("The title and headings are permissible indicators of meaning.").

[69] *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *accord* Scalia & Garner, *supra*, at 222 ("[A] title or heading should never be allowed to override the plain words of a text.").

[70] *Moore*, 71 F.4th at 395 (cleaned up).

[71] *Dubin v. United States*, 599 U.S. 110, 121 (2023) (cleaned up).

"representation"—a nominalization[72] of the verb "represent," which ordinarily means "to portray or depict; [or] present the likeness of, as a picture does"[73]—is defined as "[a]n image, likeness, or reproduction in some manner of a thing"[74] or simply "[t]hat which represents."[75] And "pictorial" is defined as "[c]onsisting of, expressed in, or of the nature of, a picture or

---

[72] A nominalization—also known as a zombie noun—is "a verb that has been buried in a longer noun." BRYAN A. GARNER, GARNER'S MODERN ENGLISH USAGE 983 (2016). Or, more technically, a nominalization is "[t]he conversion of a part of speech into a nominal"—that is, "[a] word, clause, or phrase that is functionally equivalent to a noun." *Id.* at 1016. Because nominalizations can often be swapped out for the verbs they nominalize, *see id.* at 983, the meaning of the underlying verb can provide a useful clue to the meaning of the nominalization. *Cf. Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

[73] *Represent*, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1634 (2d unabridged ed. 1987); *see also Represent*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1104 (William Morris ed., 2d ed. 1980) [hereinafter AMERICAN HERITAGE DICTIONARY, 2D]; *Represent*, 13 THE OXFORD ENGLISH DICTIONARY 658 (J.A. Simpson & E.S.C. Weiner eds., 2d ed. 1989) ("To exhibit by means of painting, sculpture, etc; to portray, depict, delineate."); *Represent*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1139 (Victioria Neufeldt & David B. Guralnik eds., 3d ed. 1996) ("to be a likeness or image of, as a picture or statue may be").

[74] *Representation*, 13 THE OXFORD ENGLISH DICTIONARY, *supra*, at 658; *see also Representation*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY, *supra*, at 1139 ("a likeness, image, or picture"); *Representation*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY, *supra*, at 1139 ("a likeness, image, picture, etc.").

[75] *Representation,* AMERICAN HERITAGE DICTIONARY, 2D, *supra*, at 1104; *see also Representation*, THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1532 (3d ed. 1996) [hereinafter AMERICAN HERITAGE DICTIONARY, 3D] ("Something that represents.").

pictures,"[76] or simply "[i]llustrated by pictures."[77] "Picture," in turn, ordinarily means "[a]ny visible image, especially one on a flat surface."[78] On first blush, therefore, the floorplans and digital renderings would seem to qualify. Each is an "image, likeness, or reproduction" that "represents" the buildings KFA designed, and they do so via visible images.

KFA, however, argues for a narrower definition of "pictorial representations," pointing to the Eighth Circuit's decision in *Designworks Homes, Inc. v. Columbia House of Brokers Realty, Inc.*, which held that § 120(a) does not apply to floorplans.[79] Though acknowledging that "floorplans might possibly qualify as 'pictorial representations' according to the contemporary definitions of those terms," *Designworks* concluded that "the broader

---

[76] *Representation*, 11 Oxford English Dictionary, *supra*, at 783; *see also Pictorial*, American Heritage Dictionary, 2d, *supra*, at 991 ("Pertaining to, characterized by, or composed of pictures."); *Pictorial*, American Heritage Dictionary, 3d, *supra*, at 1370 ("Relating to, characterized by, or composed of pictures."); *Pictorial*, Merriam-Webster's Collegiate Dictionary 879 (10th ed. 1993) ("of, relating to, or consisting of pictures"); *Pictorial*, The Random House Dictionary of the English Language, *supra*, at 1465 ("pertaining to, expressed in, or of the nature of a picture"); Webster's New World College Dictionary, *supra*, at 1022 ("of, containing, or expressed in pictures").

[77] *Pictorial*, American Heritage Dictionary, 3d, *supra*, at 1370.

[78] *Picture*, American Heritage Dictionary, 2d, *supra*, at 991; *see also Picture*, American Heritage Dictionary, 3d, *supra*, at 1370 ("A visual representation or image painted, drawn, photographed, or otherwise rendered on a flat surface."); *Picture*, Merriam-Webster's Collegiate Dictionary, *supra*, at 880 ("a design or representation made by various means (as painting, drawing, or photograph"); *Picture*, The Random House Dictionary of the English Language, *supra*, at 1465 ("a visual representation of a person, object, or scene, as a painting, drawing, photograph, etc." or "any visible image, however produced"); *Picture*, Webster's New World College Dictionary, *supra*, at 1022 ("an image or likeness of an object, person, or scene produced on a flat surface, esp. by painting, drawing, or photograph").

[79] 9 F.4th 803, 811 (8th Cir. 2021).

statutory context" pointed in the other direction.[80] Instead, it limited "pictorial representations" to those "created for [artistic] reasons" as opposed to those that merely "serve a functional purpose."[81]

I agree with *Designworks* on one thing: "[i]n textual interpretation, context is everything."[82] I disagree, however, that § 120(a)'s context—whether "the specific context in which [the phrase] appears" or "the broader context of the statute as a whole"[83]—supports a crabbed interpretation of "pictorial representations."

Start with the specific context. The twin principles of *noscitur a sociis* ("it is known by its associates")[84] and *ejusdem generis* ("of the same kind or class")[85] form the backbone of *Designworks*' reasoning.[86] *Noscitur a sociis* (also known as the associated-words canon)[87] "teaches that a word is given

---

[80] *Id.* at 808.

[81] *Id.*

[82] Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of United States Federal Courts in Interpreting the Constitution and Laws*, *in* A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW 37 (new ed. 1997); *see also* SCALIA & GARNER, *supra*, at 167 ("Context is a primary determinant of meaning."); *Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (BARRETT, J., concurring) ("To strip a word from its context is to strip that word of its meaning."); Alana Frederick & Kevin Newsom, *Meaning, Understanding, and Contextual Textualism*, 135 YALE L.J. 2614, 2626 (2026) ("[B]ecause ordinary people understand language in context, judges should likewise interpret language in context—in all of its convoluted, multifaceted glory.").

[83] *Fischer v. United States*, 603 U.S. 480, 486 (2024) (cleaned up).

[84] SCALIA & GARNER, *supra*, at 195.

[85] *RSBCO v. United States*, 104 F.4th 551, 557 n.3 (5th Cir. 2024) (citation omitted).

[86] *See Designworks*, 9 F.4th at 808–10.

[87] *See* SCALIA & GARNER, *supra*, at 195.

more precise content by the neighboring words with which it is associated."[88] *Ejusdem generis* is merely a specific application of *noscitur a sociis*.[89] It "applies when [Congress] has tacked on a catchall phrase"—here "other pictorial representations"—"at the end of an enumeration of specifics."[90] And it suggests that we should read such formulations as though the word "similar" was inserted after "other" (here, "other *similar* pictorial representations").[91]

These canons are not magic. They simply reflect "common sense intuition[s]" about how Congress speaks (and how ordinary people understand).[92] For example, most people would intuitively understand that a sign posted at a zoo "that reads, 'do not pet, feed, yell or throw objects at the animals, or otherwise disturb them'" does not cover "a visitor [who] eats lunch in front of a hungry gorilla"—even though "the smell of human food . . . might well disturb gorillas."[93] Why? Because "the specific

---

[88] *Fischer*, 603 U.S. at 487 (cleaned up).

[89] *See* 2A Norman Singer & Shambie Singer, Sutherland Statutes and Statutory Construction § 47.17 (7th ed. 2025) ("*Ejusdem generis* . . . is a variation of the maxim *noscitur a sociis*.").

[90] Scalia & Garner, *supra*, at 199.

[91] *Id.*

[92] *Fischer*, 603 U.S. at 487; *see* Scalia & Garner, *supra*, at 199 ("This canon parallels common usage."); Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 933 (2013) (finding that surveyed legislative drafters know and employ the concepts underlying *noscitur a sociis* and *ejusdem generis*); Kevin Tobia, Brian G. Slocum, & Victoria Nourse, *Statutory Interpretation from the Outside*, 122 Colum. L. Rev. 213, 258–60 (2022) (finding empirical evidence that *noscitur a sociis* and *ejusdem generis* reflect ordinary understanding).

[93] *Fischer*, 603 U.S. at 487–88.

examples . . . all involve direct interaction with and harassment of the zoo animals."[94]

However, *noscitur a sociis* and *ejusdem generis* must be wielded with care. Because "everything is similar in infinite ways to everything else,"[95] it can be difficult to identify the relevant similarities between the surrounding words that might shed light on the term at issue.[96] If a list includes "lions, tigers, and other animals," is the relevant class "wildcats" or "all dangerous wild animals"?[97] Our task is to "ask what category would come into the reasonable person's mind."[98]

Here, the full list includes "pictures, paintings, photographs, or other pictorial representations of the [architectural] work."[99] *Designworks* identified the relevant similarity—the "certain quality" that the items in the list have in common—as "artistic expression," as juxtaposed against "functional purpose[s]."[100] I disagree; while some pictures and photographs are produced for artistic purposes, others are (like the floorplans and renderings here) chiefly utilitarian. Consider a crime scene photograph, for example: it is produced not as a means of artistic expression but as a means of preserving evidence. Similarly, a picture might be artistic—or it might be functional. While every item on the list can *include* artistic expression, the

---

[94] *Id.* at 488.

[95] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (2022) (cleaned up).

[96] *See* Scalia & Garner, *supra*, at 207 ("[T]he doctrine often gives rise to the question how broadly or narrowly to define the class delineated by the specific items listed.").

[97] *See id.* at 207–08.

[98] *Id.* at 208.

[99] 17 U.S.C. § 120(a).

[100] *Designworks*, 9 F.4th at 808.

only one that arguably *connotes* such expression is "paintings." But even assuming that "paintings" carries that connotation, one item does not a pattern make. And a catchall like "other pictorial representations" takes its color from the enumeration as a whole, not from its least representative member. That a single listed term—"paintings"—may lean artistic no more shrinks the catchall to artistic works than it turns the neighboring "photographs" into an artistic-only term. Instead, the common thread is the one the text itself identifies: pictures, paintings, and photographs are all *pictorial*—they all illustrate the work via pictures.

*Designworks* also appealed to the broader context. It pointed to two "alternative terms" that appear elsewhere in the Copyright Act and would have more clearly included floorplans.[101] But neither of the alternative terms *Designworks* proposed would have been a substitute for "other pictorial representations." First, *Designworks* pointed to § 101's use of "technical drawings, including architectural plans" as part of the definition of PGS works.[102] Second, it pointed to the reappearance of the term "technical drawing" in the definition of a "work of visual art."[103] But there is an obvious reason that "technical drawing" could not have substituted for a broad reading of "other pictorial representations": Congress meant to include both functional, technical representations and artistic expression, not just one or the other.

If Congress used the term "primary colors," we would never assume it meant only blue and yellow simply because the word "red" appeared in a related statute. The better inference would be that Congress meant "red" to

---

[101] *Id.* at 807–08.

[102] *Id.* at 807 (quoting 17 U.S.C. § 101).

[103] *Id.* (quoting 17 U.S.C. § 101).

refer only to red and "primary colors" to refer to a broader set of which red is merely one member. The same inference is appropriate here: by referring to "other pictorial representations," Congress meant not to exclude technical, functional images but to include them alongside artistic expression.[104] Congress's use of a broader term cannot justify a narrower interpretation.

Far from justifying a narrower, artistic-only reading of "other pictorial representations," the broader statutory context refutes that interpretation. The term "pictorial representation" appears four other times in the copyright statute.[105] Under the Copyright Act, the author of an "original design" that makes a "useful article" "attractive or distinctive in appearance to the purchasing or using public" may obtain copyright protection for that design.[106] Under § 1310(h), registering such a copyright requires the author to submit "a drawing or other pictorial representation of the useful article embodying the design."[107] This pictorial representation is then included in the certificate of registration and made available to the public by the Copyright Administrator.[108]

Why is this significant? Because the pictorial representations § 1310(h) envisions are not created for an artistic purpose. Rather they are "part of the application" for registration—a solely utilitarian function.[109]

---

[104] *Cf.* SCALIA & GARNER, *supra*, at 170 ("If [a statute] says *land* in one place and *real estate* later, the second provision presumably includes improvements as well as raw land.").

[105] *See* 17 U.S.C. §§ 1310(h), 1314, 1315(a)–(b).

[106] *Id.* § 1301(a)(1).

[107] *Id.* § 1310(h).

[108] *Id.* §§ 1314, 1315.

[109] *Id.* § 1310(h).

Interpreting "pictorial representations" in § 120(a) to refer solely to non-utilitarian images would therefore require us to assume that Congress used the term differently in § 120(a) than it did in § 1310(h)—an assumption courts should not make lightly.[110]

*Designworks* musters one final argument in favor of its artistic-only interpretation. Section 120(a) applies only "if the building in which the work is embodied is located in or ordinarily visible from a public place."[111] And, as *Designworks* observes, "[f]loorplans typically stem from someone's access to the interior of the building" rather than from "features of a building [that] are discernible from the outside."[112] Thus, *Designworks* inferred, "Congress did not appear to be directing § 120(a) toward floorplans."[113] But this argument at most proves that Congress did not specifically contemplate applying § 120(a) to floorplans. It says nothing about whether floorplans fall within the category Congress selected—"pictorial representations." "The judicial task is to read words, not minds."[114] The argument strays into telepathy, and it cannot overcome § 120(a)'s plain meaning.

In short, § 120(a) covers all pictorial representations—whether created for artistic, functional, or mixed purposes.

---

[110] *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 571 (2012) ("As we have said before, it is a normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning." (cleaned up)).

[111] 17 U.S.C. § 120(a).

[112] *Designworks*, 9 F.4th at 810.

[113] *Id.*

[114] *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1557 n.5 (2026).

b. Pre-Construction Images

Next, KFA argues that § 120(a) does not apply to pictorial representations created before the building embodying the work was constructed. Once again, I disagree. True, § 120(a) applies only once the "architectural work . . . has been constructed."[115] But that temporal limitation does not invariably depend on when the pictorial representation was created (as KFA contends). Rather, it depends on when the act giving rise to potential liability—whether that act be "making, distributing, or public[ly] display[ing]" the pictorial representation[116]—occurred.

I start by addressing KFA's broadest argument: that § 120(a) applies only to pictures created by viewing the constructed building. On this reading, § 120(a)'s applicability turns not on the when but on the how: if a pictorial representation is made in some way other than by viewing the building in which the work is embodied, it is not protected. The problem with this reading is that nothing in the statutory text asks how the pictorial representation was made. Instead, it asks simply whether the "architectural work . . . has been constructed" and whether "the building in which the work is embodied is located in or ordinarily visible from a public place."[117] Those are questions about the work and the building embodying it, not about the pictorial representation. Section 120(a)'s applicability turns on the when, not the how.

The text reveals what must happen after construction for § 120(a) to apply: the "making, distributing, or public display" that the copyright holder

---

[115] 17 U.S.C. § 120(a).

[116] *Id.*

[117] *Id.*

seeks "to prevent"[118] (or, in a damages suit, to impose liability for). That understanding comports with the general understanding of when copyright infringement occurs. For statute-of-limitations purposes, for example, a claim accrues "when an *infringing act* occurs."[119] And "when a defendant commits successive violations, the statute of limitations runs separately from each violation."[120] The text suggests that § 120(a) works the same way: we assess whether the work "has been constructed" at the time of the "making, distributing, or public display" at issue.

KFA's counterargument—that this interpretation allows "pre-existing infringing images" to be "magically transmuted into legal non-infringing ones"—is unavailing. Section 120(a) does not operate on an image-by-image level. Instead, it operates on an action-by-action level. If the "making, distributing, or public display" is covered by § 120(a), the defendant is not liable for that "making, distributing, or public display." Although § 120(a) does not retroactively immunize actions that were infringing when taken, it also does not allow a defendant to be held liable for *later* actions that would otherwise be covered simply because he had *previously* committed unprotected infringement. The question remains whether the specific actions of purported infringement occurred before or after § 120(a) kicked in.

Here, the district court took judicial notice that each of KFA's works had been constructed at least once by 2018.[121] But the complaint is silent as

---

[118] *Id.*

[119] *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 670 (2014) (emphasis added).

[120] *Id.* at 671.

[121] Because KFA does not challenge the district court's decision to take judicial notice, we take it as a given.

to when the "making, distributing, or public display" occurred. For Rule 12(b)(6) purposes, therefore, the key question is who bears the burden of pleading that § 120(a) is inapplicable. If § 120(a) is an element of KFA's cause of action, then KFA had to plead that the "making, distributing, or public display" occurred before 2018. If, by contrast, § 120(a) is an affirmative defense, then it is "not something the plaintiff must anticipate and negate in her pleading."[122] Rather, it would be "incumbent on the *defendant* to plead" § 120(a)'s applicability.[123] In that case, a Rule 12(b)(6) dismissal is appropriate only if "the affirmative defense appears on the face of the complaint."[124]

Section 120(a) is best classified as an affirmative defense. "There is a well-settled general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits."[125] Accordingly, we have recognized that "[s]tatutory exemptions . . . must be pleaded as affirmative defenses."[126] "That longstanding convention is part of the backdrop against which the Congress writes laws, and we respect it unless we have compelling reasons to think that Congress meant to put the burden . . . on the other side."[127] I see no such compelling reasons here. The

---

122 *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017).

123 *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (emphasis added).

124 *3 Star Props.*, 6 F.4th at 604.

125 *Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025) (cleaned up).

126 *Crown Castle Fiber, L.L.C. v. City of Pasadena*, 76 F.4th 425, 438–39 (5th Cir. 2023); *see Oden v. Oktibbeha County*, 246 F.3d 458, 467 n.10 (5th Cir. 2001) (noting the many "cases concluding that statutory exemptions should be pleaded as affirmative defenses").

127 *Meacham v. Knolls Atomic Power Lab'y*, 554 U.S. 84, 91–92 (2008).

timing element confirms the point: whether the work "has been constructed" when the challenged act occurs is a component of the § 120(a) safe harbor a defendant invokes to escape liability , not an element of KFA's infringement claim—so it is the defendant's to establish , not KFA's to negate. Indeed, treating § 120(a) as an affirmative defense simply comports with how the other exceptions spelled out in the Copyright Act are treated.[128]

Because § 120(a) is an affirmative defense, KFA had no obligation to "anticipate and negate" it in the complaint.[129] Instead, dismissal was appropriate only if the elements of the § 120(a) defense—including that the "making, distributing, or public display" occurred after the work had "been constructed"[130]—"appear[] on the face of the complaint."[131] Here, the complaint was silent as to when the infringing actions occurred. If § 120(a) was an element of the cause of action, that silence might have required dismissal.[132] But because § 120(a) is an affirmative defense, silence prevents dismissal.

Because it does not appear on the face of the complaint whether any of the allegedly infringing acts occurred before the works were constructed,

---

[128] *See* 3 William F. Patry, Patry on Copyright § 8:22 ("Entitlement to those limitations is an affirmative defense; thus, in order to make out a prima facie case of infringement, the plaintiff need only prove ownership of a valid copyright, ownership of the right that was infringed, and violation of the right by defendant. The defendant bears the burden of proving its acts were privileged, licensed, or exempt."); *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 547 n.21 (2023) ("[F]air use is an affirmative defense . . . .");

[129] *Perry*, 582 U.S. at 435 n.9.

[130] 17 U.S.C. § 120(a).

[131] *3 Star Props.*, 6 F.4th at 604.

[132] *See Twombly*, 550 U.S. at 557 (noting that allegations "merely consistent with" liability are not sufficient to withstand a motion to dismiss).

the district court erred in dismissing KFA's architectural-works copyright claims under § 120(a).

3. Contributory Infringement

AHV points to one potential alternative ground for affirming the dismissal of the claims against it: KFA's failure to allege facts supporting contributory infringement. The district court, however, did not reach this argument—instead resting its dismissal of this claim on its conclusion that there was no direct infringement. It is not necessary to decide this issue in the first instance. That task is best left to the district court on remand.

**B. Digital Millenium Copyright Act**

I turn next to the DMCA claims. KFA argues that the defendants violated § 1202(b) by creating and distributing floorplans and digital renderings that did not contain KFA's CMI. The district court dismissed the DMCA claims, reasoning that failure to include KFA's CMI on newly-created floorplans and renderings does not qualify as "remov[ing]" the CMI. It also rejected KFA's argument that the License Agreements prevented the defendants from arguing that their conduct did not violate the DMCA, reasoning that "private parties cannot rewrite the elements of a statute via contract." I agree with both conclusions.

1. License Agreements

Start with KFA's threshold objection: that the License Agreements prevent the defendants from arguing that their conduct did not violate § 1202(b). This argument fails for a simple reason: "litigants cannot bind us

to an erroneous interpretation of federal legislation."[133] We must determine for ourselves whether the conduct alleged violates § 1202(b).

KFA attempts to circumvent that principle by invoking the doctrine of estoppel by contract. Estoppel by contract is "a form of quasi-estoppel" that "preclude[s] a person from asserting, to another's disadvantage, a right inconsistent with a position previously taken."[134] It comes in two forms.[135] The first—"estoppel arising from acts done under, or in performance of the contract"[136]—is inapplicable because KFA asserts estoppel based on the License Agreements themselves, not acts done under or in performance of it. The second—"estoppel to deny facts settled by contract"[137]—is likewise inapplicable because the correct interpretation of § 1202(b) is not a "fact"—it is a pure question of law.

KFA's reliance on the Tenth Circuit's decision in *Cellport Systems, Inc. v. Peiker Acustic GMBH & Co. KG* is misplaced.[138] KFA cites *Cellport Systems* for its conclusion that "no [patent] infringement analysis [was] necessary" in light of the parties' contractual acknowledgement that the defendant would owe royalties on the products at issue.[139] But *Cellport*

[133] *Nat'l Aeronautics & Space Admin. v. Fed. Lab. Rels. Auth.*, 527 U.S. 229, 245 n.9 (1999); *accord, e.g.*, *United States v. Navarro*, 54 F.4th 268, 274 n.3 (5th Cir. 2022) ("A court is not bound by the parties' stipulations of law, particularly when those stipulations are erroneous." (citation omitted)).

[134] *Salas v. LNV Corp.*, 409 S.W.3d 209, 217 n.2 (Tex. App. 2013).

[135] 31 C.J.S. *Estoppel and Waiver* § 70 (2026) ("There are two forms of what has been termed 'estoppel by contract,' . . . ."); *accord* O'Connor's Texas Causes of Action, ch. 49-A, § 2.4 ("There are two kinds of estoppel by contract[.]").

[136] 31 C.J.S. *Estoppel and Waiver* § 70.

[137] *Id.*

[138] 762 F.3d 1016 (10th Cir. 2014).

[139] *See id.* at 1022–23.

*Systems* was not an infringement suit—it was a breach-of-contract case.[140] An infringement analysis was unnecessary not because statutory liability could be imposed without conducting that analysis but because a breach-of-contract suit does not require infringement.[141] Here, by contrast, KFA's claim is not for breach of contract but for a violation of § 1202(b) itself.

KFA's other examples all involve either (1) a factual question or (2) a defense or procedural right that can be waived. For example, KFA points to contractual stipulations that a given fact in a financial statement will be considered "material" in a subsequent securities fraud suit.[142] Materiality, however, often involves determinations that "are peculiarly . . . for the trier of fact."[143] And "[p]arties can stipulate to issues of fact."[144] KFA's analogy to forum-selection clauses is likewise inapposite because improper venue is a procedural defense that can be waived.[145] The proper interpretation of § 1202(b), by contrast, is a pure question of law. And parties "cannot by stipulation amend the law."[146]

---

[140] *Id.* at 1023 ("The complaint states contract claims, and those claims do not necessarily rely on patent law.").

[141] *Id.* (noting that the License Agreement required the defendant to pay royalties "[b]y its own force").

[142] *See generally* 3 Alan R. Bromberg & Lewis D. Lowenfels, Bromberg & Lowenfeld on Securities Fraud § 8.8 *et seq.* (2d ed. 2026) (discussing the materiality requirement).

[143] *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

[144] *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024).

[145] *See* Fed. R. Civ. P. 12(h).

[146] *Alexander*, 602 U.S. at 19 n.6.

Nevertheless, KFA suggests that the License Agreement controls because courts have divided over the correct interpretation of § 1202(b).[147] However, it cites no authority for the proposition that a split of authority allows parties to stipulate to the meaning of federal statutes. KFA's broader policy concern—that the rule forbidding parties from stipulating to an incorrect legal interpretation prevents the parties from obtaining certainty—is also misplaced. Parties remain free to use contracts to clarify (or, in some cases, modify) their obligations to one another. If one party wants to impose duties on the other that the law might not otherwise impose, she can insist on including that duty in the contract. But when that duty is breached, the resulting cause of action will be for breach of contract—not for a statutory violation. (This is precisely what occurred in *Cellport Systems*, on which KFA relies.)[148] Similarly, if one party wants to avoid liability to the other, she can insist on a prospective liability waiver[149]—so long as the waiver does not violate public policy.[150] But once again, the remedy will be contractual, not statutory.

---

[147] The parties dispute whether there is a true split of authority as to the correct interpretation of § 1202(b). Because any split is irrelevant to the question before us, it is not necessary to answer that question.

[148] *See Cellport Sys., Inc.*, 762 F.3d at 1023.

[149] *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 20 S.W.3d 692, 698 (Tex. 2000) ("[A] valid release may encompass unknown claims and damages that develop in the future.").

[150] Examples of waivers that violate public policy include waivers of liability under Title VII, *see Rogers v. Gen. Elec. Co.*, 781 F.2d 452 (5th Cir. 1986), or the FLSA, *see Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981), or for gross negligence, *see Zachry Constr. Corp. v. Port of Hou. Auth. of Harris Cnty.*, 449 S.W.3d 98, 116 (Tex. 2014). I express no view on whether prospective waivers of DMCA liability violate public policy. I note, however, that even if such waivers are invalid, a similar result could be achieved by the copyright holder granting the other party authorization. *See* 17 U.S.C.

Parties retain broad freedom to structure their interactions using contracts. But that freedom does not include an unfettered right to turn contractual violations into statutory ones. Although KFA frames the district court's choice to interpret § 1202(b) for itself as a judicial power grab, the district court did no more than "say what the law is"—which is "emphatically" its "province and duty."[151] That was not error.

2. DMCA Removal

Of course, that the district court did not err by interpreting § 1202(b) does not mean that it interpreted the statute correctly. Thus, we must exercise *our* province and duty to say whether the district court got it right. On that score, the key question is whether § 1202(b)'s prohibition on removal also creates an affirmative obligation to add CMI where it was not present to begin with. I agree with the district court that it does not.

Section 1202(b) provides:

> No person shall, without the authority of the copyright owner or the law—
>
> (1) intentionally remove or alter any copyright management information,
>
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or
>
> (3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing

§ 1202(b) (requiring that the violation occur "without the authority of the copyright owner").

[151] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

> that copyright management information has been removed or altered without authority of the copyright owner or the law,
>
> knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.[152]

KFA's theory is not entirely clear; its brief never says which paragraph of § 1202(b) the DMCA claim arises under. However, each paragraph requires that the CMI be "removed" or "altered." Because the statute does not define either term, I look to the ordinary meaning.[153]

The word "remove" has several definitions, ranging from "[t]o move from a place or position occupied"[154] to "[t]o transfer or convey from one place to another"[155] to "to take away, withdraw, or eliminate."[156] One

---

[152] 17 U.S.C. § 1202(b).

[153] *See HollyFrontier Cheyenne Refin., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021) ("Where Congress does not furnish a definition of its own, we generally seek to afford a statutory term its ordinary or natural meaning." (cleaned up)).

[154] *Remove*, American Heritage Dictionary, 3d, *supra*, at 1527; *see also Remove*, 13 The Oxford English Dictionary, *supra*, at 602 ("To move or shift from or out of the place occupied;"); *Remove*, The Random House Dictionary of the English Language, *supra*, at 1630 ("to move from a place or position"); *Remove*, Webster's New World College Dictionary, *supra*, at 1136 ("to move (something) from where it is").

[155] *Remove*, American Heritage Dictionary, 3d, *supra*, at 1527; *see also Remove*, 13 The Oxford English Dictionary, *supra*, at 602 ("To move, shift, transfer, or convey from one place to another;"); *Remove*, The Random House Dictionary of the English Language, *supra*, at 1630 ("to move or shift to another place or position, transfer"); *Remove*, Webster's New World College Dictionary, *supra*, at 1136 ("lift, push, transfer, or carry away, or from one place to another"); *Remove*, Merriam-Webster's Collegiate Dictionary, *supra*, at 990 ("to change the location, position, station, or residence of").

[156] *Remove*, The Random House Dictionary of the English Language, *supra*, at 1630; *see also Remove*, American Heritage Dictionary,

dictionary defines it as simply "to take off."[157] There is no need to settle on a particular definition, because each has a common thread: the object of the verb was there before it was removed, but once it is removed it is no longer there.

Similarly, dictionaries define "alter" as "[t]o change or make different; modify."[158] This, of course, presumes that the thing being altered was present in the first place. Indeed, some definitions specify that altering something must not "chang[e] [it] into something else."[159] "Alter," then, does not refer to creation (or failure to create)—it refers to changes made to something already present.

In short, both "remove" and "alter" require something that was present but is now either not present at all or remains present but has been

---

3D, *supra*, at 1527 ("To do away with; eliminate"); *Remove*, 13 The Oxford English Dictionary, *supra*, at 602 ("To take away, withdraw, from a place, person, etc."); *Remove*, Webster's New World College Dictionary, *supra*, at 1136 ("to do away with, specif., . . . to get rid of; eliminate").

[157] *Remove*, Webster's New World College Dictionary, *supra*, at 1136.

[158] *Alter*, American Heritage Dictionary, 3D, *supra*, at 55; *see also Alter*, 1 The Oxford English Dictionary, *supra*, at 365 ("To make (a thing) otherwise or different in some respect; to make some change in character, shape, condition, position, quantity, value, etc. without changing the thing itself for another; to modify, to change the appearance of."); *Alter*, The Random House Dictionary of the English Language, *supra*, at 60 ("to make different in some particular, as size, style, course, or the like; modify"), *Alter*, Merriam-Webster's Collegiate Dictionary, *supra*, at 34 ("to make different without changing into something else"); *Alter*, Webster's New World College Dictionary, *supra*, at 40 ("to make different in details but not in substance; modify").

[159] *Alter*, Merriam-Webster's Collegiate Dictionary, *supra*, at 34; *see also Alter*, 1 The Oxford English Dictionary, *supra*, at 365 ("without changing the thing itself for another"); *Alter*, Webster's New World College Dictionary, *supra*, at 40 ("to make different in details but not in substance").

changed in some way. That is not what happened here. KFA's CMI was present on the copies of its works that it sent to AHV and, so far as the complaint says, remains there unaltered. And KFA's CMI was never present on the floorplans and digital renderings, so it cannot have been removed or altered. That dooms KFA's DMCA claims.

KFA makes several counterarguments, but none persuade.

First, KFA points to a single allegation stating that the floorplans and digital renderings were "copies of KFA's architectural works that had KFA's [CMI] removed or altered." This allegation, KFA argues, must be taken as true, requiring us to conclude that the defendants removed KFA's CMI. This argument misunderstands the pleading standard. True, we must take the complaint's factual allegations as true.[160] But the same is not true of the complaint's legal conclusions, which we not only may but must disregard.[161] Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[162] KFA's allegation—which merely parrots the statutory text without alleging underlying facts—is a textbook legal conclusion. It thus cannot help them clear the Rule 8(a)(2) bar.[163]

---

[160] *See Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity . . . ."); *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.").

[161] *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

[162] *Id.*

[163] *See Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) ("The conclusory allegation to the effect of 'CMI was removed' will not suffice.").

Second, KFA argues at length that the floorplans and digital renderings are "copies" of its architectural works, as § 101 defines "copies." But even granting that premise for sake of argument, it does not rescue KFA's DMCA claims. Section 1202(b) uses "copies" only in paragraph (b)(3), which makes it unlawful to "distribute . . . copies of works . . . knowing that [CMI] has been removed or altered without authority of the copyright owner or the law."[164] But as discussed above, even assuming the floorplans and digital renderings are copies, they never had KFA's CMI to begin with and so no CMI was "removed" or "altered."

Third, KFA argues that the district court's interpretation improperly removes derivative works from § 1202(b)'s scope. This, KFA insists, reads an additional limitation into the DMCA, which "says nothing about limiting its scope to removal of copyright management from 'original works.'" This argument misunderstands the district court's holding. Section 1202(b)'s plain text does not focus on whether the accused copy is identical to the copy that contained CMI. Instead, it asks simply what has been done to the CMI: has it been removed or altered? If the answer is yes, DMCA liability will attach (assuming the other elements are satisfied)—whether or not the accused copy is identical to the copy in connection with which the CMI was conveyed. Requiring removal or alteration is not rewriting the statute; dispensing with that requirement is.

Finally, KFA charges that requiring literal removal or alteration would "reduce . . . § 1202(b) to meaningless ashes." To illustrate the supposed absurdity, KFA posits a hypothetical. Suppose that a copy of a poem contains a copyright notice at the bottom of the page. However, instead of cutting out the copyright notice, the defendant instead retypes the poem,

---

[164] 17 U.S.C. § 1202(b)(3).

excluding the CMI. By requiring removal or alteration, KFA insists, the plagiarist escapes § 1202(b) liability merely by using a keyboard instead of scissors. But the keyboard-using plagiarist is just as liable under § 1202(b)'s plain meaning as the scissors-using plagiarist. Reproducing everything but the CMI removes CMI just as surely as erasing it does. But again, that is not what happened here: the floorplans and digital renderings do not reproduce any part of the copies of KFA's works to which the CMI was affixed.[165]

This case provides no occasion to consider the outer limits of liability based on substantial or complete reproduction of the work to which the CMI was affixed but omitting the CMI. Wherever the line is, the floorplans and digital renderings here—which are in an entirely different medium than the architectural works and technical drawings that contained the CMI—fall well short of it.

## V. Conclusion

We AFFIRM the dismissal of KFA's DMCA claims. However, we VACATE the dismissal of KFA's copyright infringement claims and REMAND for further proceedings.

[165] *See Fischer v. Forrest*, 286 F. Supp. 3d 590, 609 (S.D.N.Y. 2018) ("In those cases where claims of removal of CMI have been held viable, the underlying work has been substantially or entirely reproduced.").

ANDREW S. OLDHAM, *Circuit Judge*, dissenting:

The plaintiff moved to dismiss some but not all of its claims under Federal Rule of Civil Procedure 41(a)(2). The district court granted that motion. The question presented is whether that gives us appellate jurisdiction. It does not. So I respectfully dissent.

## I

Kipp Flores Architects, LLC ("Kipp Flores") sued American Housing Ventures, LLC, AMH Creekside Development, LLC, and American Homes 4 Rent over their alleged use of Kipp Flores's designs and plans for residential homes. Kipp Flores brought several claims against each defendant.

All three defendants moved to dismiss. The district court granted each defendant's motion on some claims but left Kipp Flores with at least one claim against each defendant.

Kipp Flores wanted to appeal the district court's partial-dismissal ruling. *See* Blue Br. at 3–4. But Kipp Flores faced a problem: Generally, a party may only appeal a "final decision[]," 28 U.S.C. § 1291, and that generally requires resolution of all claims against all parties, *see Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 431–34 (1956). So what to do with the still-pending claims?

Kipp Flores tried to "dismiss" the rest of its claims under Federal Rule of Civil Procedure 41. ROA 1131. The problem is that Rule 41 only allows plaintiffs to dismiss "an action"—not *claims* that are part of an action. FED. R. CIV. P. 41(a). Therefore, the district court should have denied Kipp Flores's Rule 41 motion because it asked for something Rule 41 plainly does not allow. Under binding Fifth Circuit precedent, "an invalid Rule 41(a) dismissal is a nullity." *Williams v. Seidenbach*, 958 F.3d 341, 345 (5th Cir.

2020) (en banc). That means the claims purportedly dismissed under Rule 41 are still "pending in district court." *Ibid.* (quotation omitted). And it means there is no final decision in the district court, and hence no appellate jurisdiction in this one.

II

We lack jurisdiction as a matter of both (A) text and (B) precedent. And (C) Judge Willett's arguments to the contrary are unavailing.

**A**

The text of Rule 41 shows that this court lacks jurisdiction. Rule 41 provides that "*an action* may be dismissed at the plaintiff's request only by court order." Fed. R. Civ. P. 41(a)(2) (emphasis added). An action is a "civil . . . judicial proceeding." *Action*, Black's Law Dictionary (12th ed. 2024) (def. 4). It's "the entire lawsuit, not just one part of it." *Williams*, 958 F.3d at 360 (Oldham, J., dissenting). A claim, by contrast, is a "part of a complaint in a civil action." *Claim*, Black's Law Dictionary (12th ed. 2024) (def. 3). So Rule 41 allows a plaintiff to dismiss his entire lawsuit, not specific claims. No amount of interpretive sophistry can change this fact: "We give the Federal Rules of Civil Procedure their plain meaning." *Pavelic & LeFlore v. Marvel Ent. Grp.*, 493 U.S. 120, 123 (1989). Thus, the district court could not have dismissed Kipp Flores's remaining claims against each defendant under Rule 41.

**B**

Precedent confirms what the text of Rule 41 says. As this court has long understood, "[w]hen Rule 41(a) refers to dismissal of an 'action', there is no reason to suppose that the term is intended to include the separate claims which make up an action." *Exxon Corp. v. Md. Cas. Co.*, 599 F.2d 659, 662 (5th Cir. 1979) (quotation omitted). Thus, a plaintiff cannot use Rule 41 to "unilaterally . . . withdraw" a claim from court; rather, that claim "is still

pending in district court." *Id.* at 663. Thus, the district court should have denied Kipp Flores's Rule 41 motion because it moved for dismissal of only some claims against each defendant.

The holding in *Exxon* is no outlier. In *Williams v. Seidenbach*, plaintiffs sued 24 defendants. 958 F.3d at 344. Some of the defendants won at summary judgment, and the plaintiffs wanted to appeal. *Ibid*. So they moved to voluntarily dismiss the remaining defendants under Rule 41(a). *Ibid*. The district court purported to grant that motion. Then, the plaintiffs moved for partial final judgment under Rule 54(b) on the claims against several defendants who had won at summary judgment. *See ibid.* The district court granted that motion, and the plaintiffs appealed. *Ibid.*

The dissenting opinion raised a potential jurisdictional problem: Rule 41(a)'s plain text suggests a plaintiff may only dismiss "an action," not individual defendants. *Id.* at 360–61 (Oldham, J., dissenting). The majority opinion did not dispute that reading of the Rule's text. *See Williams*, 958 F.3d at 344–45 (majority opinion). And the majority cited *Exxon* for the proposition that it would be "impermissible" to use Rule 41 to "dismiss[] . . . individual claims." *Id.* at 345 (citing *Exxon*, 599 F.2d at 662–63). Then the majority explained that, if the district court granted such an impermissible or "invalid" Rule 41 motion, the resulting dismissal would be a "nullity." *Ibid*. And as a result, "the claims against the purportedly dismissed defendants would still be 'pending in district court.'" *Ibid.* (quoting *Exxon*, 599 F.2d at 663). That controls this case.

So too with *National Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869 (5th Cir. 2022). After a group of plaintiffs brought a host of claims, the defendants moved to dismiss. *See id.* at 875. An intervener then brought some of the same claims as the other plaintiffs and an additional "anti-commandeering claim." *Ibid.* The district court granted the motion to

dismiss. *Ibid.* But it did not dismiss the intervenor's anti-commandeering claim. *Ibid.* Then, the intervenor sought to voluntarily dismiss that remaining claim under Rule 41. *Ibid.* And the district court purported to enter final judgment. *Ibid.* The plaintiffs appealed. *Id.* at 875–76.

The Fifth Circuit held that the "notice of appeal was premature." *Id.* at 878. Although the district court had purported to enter final judgment, that "final judgment was invalid." *Ibid.* As the court explained, "Rule 41(a) does not allow dismissal of individual claims." *Id.* at 878 n.15. So while the court "*purported* to dismiss . . . Texas's anti-commandeering claim under Rule 41(a)," the claim was still pending in district court. *Ibid.* (emphasis added).

So if Rule 41's text weren't enough, Fifth Circuit precedent controls this case.[1] The district court purported to grant an order dismissing only certain claims against each defendant. That was "invalid" and a "nullity." *Williams*, 958 F.3d at 345. So the claims were not dismissed but remain "pending in district court." *Ibid.* (quotation omitted). Thus, there was no final decision for Kipp Flores to appeal. The text of Rule 41 and *Exxon*, *Williams*, and *National Horsemen's* compel this result.

### C

The majority says we have appellate jurisdiction—but there is no majority opinion to explain why. JUDGE WILLETT, speaking only for himself, says *Exxon*, *Williams*, and *National Horsemen's* are all irrelevant because their holdings are mere dicta. *Ante*, at 9–12. If there were a majority opinion to that effect, I would have much to say about it. As it is, I'll let our cases speak for themselves.

---

[1] This plain-text interpretation of Rule 41 is in good company. *See Williams*, 958 F.3d at 361 (OLDHAM, J., dissenting) (collecting alike cases from the Eleventh, Seventh, and Second Circuits).

JUDGE WILLETT's other contention is that "a district court's misapplication of the Rules [cannot] strip us of jurisdiction to correct it." *Ante*, at 8. But with greatest respect, that is not true. A district court can misapply Rule 12 or Rule 56 and refuse to dismiss a case, but we'd lack jurisdiction to review it. *See* 15A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE, § 3905 (3d ed. 2026 update) [hereinafter "WRIGHT & MILLER"]. A district court can improperly refuse to enter judgment under Rule 54(b), and that's not reviewable. *See id.* § 3914.7. A district court can improperly refuse to certify a decision under 28 U.S.C. § 1292(b), and that's not reviewable. *See id.* § 3929; *In re Mesaros*, No. 23-50593 (5th Cir. Aug. 28, 2023); *In re Park*, No. 23-50585 (5th Cir. Sep. 13, 2023). In each of these examples, the district court did something that it should not have done. For example, the district court in *Mesaros* "*unquestionably*" erred in denying certification under § 1292(b). *Mesaros*, No. 23-50593, at 6 (emphasis in original); *see also id.* at 6–9 (collecting the district court's errors). But those errors did not give appellate jurisdiction under § 1292(b). *See* WRIGHT & MILLER, § 3929. And we were compelled to allow the district court's mistakes to stand. *Mesaros*, No. 23-50593, at 9–10.

I respectfully dissent.